Teague v. Bayer AG, 2007 NCBC 12

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
                                        SUPERIOR COURT DIVISION
COUNTY OF BUNCOMBE                       05 CVS 90

MITCHELL TEAGUE, on behalf of himself
and all others similarly situated,

                 Plaintiff,

     v.

BAYER AG; BAYER POLYMERS, LLC,
n/k/a BAYER MATERIALSCIENCE, LLC;       ORDER ON MOTION TO DISMISS
BAYER CORPORATION; CROMPTON        SECOND AMENDED COMPLAINT
CORPORATION; UNIROYAL CHEMICAL    AND FOR APPROVAL OF DISMISSAL OF
COMPANY, INC., n/k/a CROMPTON           CLASS ACTION CLAIMS
MANUFACTURING COMPANY, INC.; THE
DOW CHEMICAL COMPANY; E.I.
DUPONT DE NEMOURS & COMPANY;
DUPONT DOW ELASTOMERS, L.L.C.;
DSM COPOLYMER, INC.; DSM
ELASTOMERS EUROPE, B.V.; EXXON
MOBIL CHEMICAL, a division or subsidiary
of EXXON MOBIL CORP.,

                 Defendants.

---

{1}     This case arises out of Plaintiff's suit for damages under sections 75-1 and 75-1.1 of

the General Statutes of North Carolina. This matter comes before the Court on certain

Defendants' Motion to Dismiss Second Amended Complaint Under Rule 12(b)(6) and Plaintiff's

motions to dismiss his North Carolina class action allegations against some defendants as a result

of a multistate settlement agreement presided over by the courts of the State of Tennessee.

{2}     After considering the briefs and oral arguments, the Court GRANTS Defendants'

Motion to Dismiss on the grounds that Plaintiff lacks standing to pursue the action. With grave

reservations and the firm belief that the class representative and his counsel have done little for

the citizens of North Carolina, the Court GRANTS Plaintiff's motions to dismiss his class action

allegations against the Bayer, Dow, and DuPont Defendants.

1

*Wimer & Jobe by Michael G. Wimer; Forman Rossabi Black, P.A. by Amiel J. Rossabi; Law Offices of Isaac L. Diel by Issac L. Diel; Weinstein, Kitchenoff Scarlato, Karon & Goldman, Ltd. by Daniel R. Karon; Law Office of Krishna B. Narine by Krishna B. Narine; Schriffrin & Barroway, LLP by Stephen E. Connolly; Gunderson, Sharp & Walke, P.C. by Rex Sharp for Plaintiff Mitchell Teague.*

*Mayer, Brown, Rowe & Maw LLP by Mary K. Mandeville, W.C. Turner Herbert, Gary A. Winters, Andrew S. Marovitz, and Britt M. Miller for Defendants DSM Copolymer, Inc. and DSM Elastomers Europe, B.V.*

*Nelson, Mullins, Riley & Scarborough, LLP by Joseph W. Eason and Christopher J. Blake; O'Melveny & Myers LLP by Ian Simmons and Benjamin G. Bradshaw for Defendants Chemtura (f/k/a Crompton) Corporation and Uniroyal Chemical Company, Inc.*

*Pinto, Coates, Kyre & Brown, PLLC by Richard L. Pinto; Weil, Gotschal & Manges, LLP by James W. Quinn, Steven Alan Reiss, and Christopher V. Roberts for Defendant ExxonMobil Chemical Company.*

Tennille, Judge.

## I.

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT UNDER RULE 12(b)(6)

## A.

## FACTUAL AND PROCEDURAL BACKGROUND

## 1.

## THE PARTIES

{3} This case involves alleged price fixing of a synthetic rubber known as ethylene propylene diene monomer, or "EPDM." Defendants are all involved in the manufacture, distribution, marketing, or sale of EPDM.

{4} Plaintiff Mitchell Teague is a citizen and resident of the State of North Carolina. Plaintiff purchased EPDM roofing material and pond liner manufactured, marketed, distributed, or sold by one or more of the Defendants. Plaintiff also purchased at least one vehicle with EPDM components during the relevant time. He brings this claim individually and on behalf of all other North Carolinians who purchased products containing EPDM from 1994 until 2002. He has held himself out to be a person suitable to represent the interests of his fellow citizens. His

2

counsel have likewise held themselves out to be suitable advocates for the interests of the North Carolina class members.

{5} Defendant Bayer AG is a corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business located in Leverkusen, Germany. Bayer AG is a management holding company that oversees operations for some 350 companies worldwide. The global enterprise operates in the fields of health care, nutrition, and high technology materials.

{6} Defendant Bayer Polymers, LLC (n/k/a Bayer MaterialScience, LLC) is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Pittsburgh, Pennsylvania. Bayer MaterialScience, LLC is a subsidiary of Bayer AG.

{7} Defendant Bayer Corporation is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in Pittsburgh, Pennsylvania. Bayer Corporation is a wholly owned subsidiary of Bayer AG.

{8} Defendant Crompton Corporation merged with Great Lakes Chemical Corporation in 2005 to form Chemtura Corporation. Chemtura is a global enterprise that manufactures and markets specialty chemicals for a variety of uses. The company is headquartered in Middlebury, Connecticut.

{9} Defendant Uniroyal Chemical Company, Inc. merged with Crompton & Knowles Corporation in 1996, became part of Crompton Corporation in 1999, and is now part of Chemtura.

{10} Defendant Dow Chemical Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Midland, Michigan.

{11} Defendant E.I. DuPont De Nemours & Company ("DuPont") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware.

{12} Defendant DuPont Dow Elastomers, LLC was a joint venture of Defendants DuPont and Dow at times relevant to this action. Dow withdrew from the partnership in 2005. DuPont operates the remaining businesses under the name DuPont Performance Elastomers.

{13} Defendant DSM Elastomers Europe, B.V. is part of a global operation headquartered in the Netherlands.

3

{14}   Defendant DSM Copolymer, Inc. is part of the DSM global operation, with its principal place of business in Baton Rouge, Louisiana.[1]

{15}   Defendant ExxonMobil Chemical Company is an entity organized and existing under the laws of the State of New Jersey with its principal place of business in Irving, Texas. ExxonMobil Chemical is a division or subsidiary of ExxonMobil Corporation.

2.

## PROCEDURAL BACKGROUND

{16}   Plaintiff filed the Complaint in this action in Buncombe County Superior Court on April 2, 2004.  Plaintiff filed the First Amended Complaint on December 23, 2004.  The case was designated complex business and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of North Carolina dated March 15, 2005.

{17}   Defendants filed motions to dismiss the original and first amended complaints in the summer of 2004 and winter of 2005.  The Court heard oral arguments on the motions on November 21, 2005.  Following the hearing, the Court entered an order giving Plaintiff an opportunity to plead facts with more precision.  (Order, Nov. 22, 2005.)  Plaintiff filed the Second Amended Complaint on December 8, 2005.  In January of 2006, Defendants renewed their motions to dismiss.

{18}   This order addresses the Motion to Dismiss the Second Amended Complaint under Rule 12(b)(6) of Defendants DSM Copolymer, Inc., Chemtura Corporation (successor by merger to Crompton Corporation and Uniroyal Chemical Company, Inc.), and ExxonMobil Chemical Company.  This order also addresses the Motion of Defendant DSN Elastomers Europe B.V. to Dismiss Second Amended Complaint under Rules 12(b)(2) and 12(b)(6).

3.

## PLAINTIFF'S ALLEGATIONS

{19}   Plaintiff alleges the following facts in his Second Amended Complaint:

{20}   As noted above, Defendants are involved in the manufacture, distribution, marketing, or sale of EPDM.  (2d Am. Compl. ¶¶ 1, 25.)  EPDM is a synthetic rubber with many and varied

---

[1] DSM Elastomers Holding Company, Inc., DSM Elastomers, Inc. and DSM Elastomers Americas were originally parties to this action.  By stipulation filed May 20, 2004, Plaintiff dismissed these three entities and substituted DSM Copolymer, Inc.  (Notice of Dismissal Without Prejudice and Stipulation Re:  Tolling and Acceptance of Service 1–2.)  DSM Copolymer, Inc. and DSM Elastomers Europe, B.V. are the only DSM-related parties currently involved as defendants in this action.

4

applications. (*Id.* ¶¶ 21, 23.) It is a "commodity product that is fungible among grades." (*Id.* ¶ 24.) EPDM itself is not a consumer product. Rather, it is a component found in many consumer products. The amount of EPDM in a given product varies depending on the nature of the product. For example, "[t]he EPDM roofing material purchased by Plaintiff and other Class Members is believed to contain at least 90% EPDM" and "[t]he tires, window molding, hoses, and other rubber products purchased by Plaintiff and other Class members is [sic] believed to include 1% or more EPDM." (*Id.* ¶ 36.) The crux of Plaintiff's allegations is that the Defendants "engaged in a combination, conspiracy and scheme to suppress and eliminate competition by fixing the price of EPDM sold in the United States and elsewhere." (*Id.* ¶ 27.) The conspiracy "consisted of a continuing agreement, understanding and concerted action among Defendants and co-conspirators." (*Id.* ¶ 28.) The Defendants allegedly colluded to issue price announcements, allocate markets and customers among themselves, and actively conceal their uncompetitive actions from consumers in North Carolina. (*Id.* ¶ 30.) These alleged actions are under investigation by antitrust authorities in the United States, Canada, and Europe. (*Id.* ¶¶ 32, 34.)

{21}  As a result of Defendants' conduct, Plaintiff and other consumers "have been forced to pay higher and supracompetitive prices for EPDM and were deceived and treated unfairly and unethically in their purchases of EPDM." (*Id.* ¶ 44.) Plaintiff paid these "supracompetitive prices" when he "purchased EPDM roofing material and pond liner manufactured, distributed, and/or sold by one or more of the Defendants." (*Id.* ¶ 35.) Plaintiff also purchased "at least one vehicle, components of which contain Defendants' EPDM." (*Id.*) Plaintiff claims that he and other North Carolina class members absorbed all of the supracompetitive portion of the price because "middlemen passed on 100% or more of the overcharge from the Defendants." (*Id.* ¶ 37.)

{22}  In sum, Plaintiff claims that "Defendants were parties to an illegal cartel, agreement, contract, combination, scheme and/or conspiracy designed to fix, raise, stabilize and maintain the price for EPDM" and conceal their conduct from consumers. (*Id.* ¶ 49.) "Defendants' contract, combination, scheme and/or conspiracy restrained trade or commerce in the State of North Carolina and affected commerce in North Carolina." (*Id.*) Plaintiff seeks "actual damages, treble damages, plus costs, pre- and post-judgment interest and attorneys' fees" under sections 75-1 and 75-1.1 of the General Statutes of North Carolina. (*Id.* ¶¶ 48, 55.) These provisions

make combinations in restraint of trade and unfair methods of competition illegal. N.C. Gen. Stat. §§ 75-1, 75-1.1 (2005).

## B.

## MOTION TO DISMISS

## 1.

## LEGAL STANDARD

{23} The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the pleading against which the motion is directed. *Sutton v. Duke*, 277 N.C. 94, 99, 176 S.E.2d 161, 163 (1970). In *Branch Banking & Trust Co. v. Lighthouse Financial Corp.*, 2005 NCBC 3 (N.C. Super. Ct. July 13, 2005), http://www.ncbusinesscourt.net/opinions/2005%20 NCBC%203.htm, this Court summarized the 12(b)(6) standard as follows:

> When ruling on a motion to dismiss under Rule 12(b)(6), the court must determine "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted." In making its decision, the court must treat the allegations in the complaint as true. The court must construe the complaint liberally and must not dismiss the complaint unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim. When considering a motion under Rule 12(b)(6), the court is not required to accept as true any conclusions of law or unwarranted deductions of fact in the complaint. When the complaint fails to allege the substantive elements of some legally cognizable claim, or where it alleges facts which defeat any claim, the complaint should be dismissed under Rule 12(b)(6).

*Branch Banking & Trust Co.*, 2005 NCBC 3 ¶ 8 (citations omitted). In this case, it is also relevant that "[a] motion to dismiss a party's claim for lack of standing is tantamount to a motion to dismiss for failure to state a claim upon which relief can be granted according to Rule 12(b)(6)." *Slaughter v. Swicegood*, 162 N.C. App. 457, 464, 591 S.E.2d 577, 582 (2004).

## 2.

## STANDING

{24} The doctrine of standing is usually considered in the context of federal jurisdiction under Article III of the United States Constitution. North Carolina state courts use the term "standing" to "refer generally to a party's right to have a court decide the merits of a dispute." *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 114, 574 S.E.2d 48, 52 (2002). A court may not properly exercise subject matter jurisdiction over the parties to an

6

action unless the standing requirements are satisfied. *Aubin v. Susi*, 149 N.C. App. 320, 324, 560 S.E.2d 875, 878 (2002). The requirements are as follows:

> (1) "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). With its concern over conjectural injuries and speculative damage awards, standing is frequently an issue in indirect purchaser cases such as this one.[2] The goal of the detailed analytical framework described below is to determine if indirect purchaser plaintiffs meet the broad standing requirements.

3.

INDIRECT PURCHASER CASES IN FEDERAL COURT

{25} In *Hanover Shoe Co. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the United States Supreme Court addressed the issue of standing for indirect purchasers under federal antitrust law. *Hanover Shoe* was a suit by a shoe manufacturer against a manufacturer of shoe machinery. 392 U.S. at 483. In defending the treble damage suit, United argued that Hanover suffered no injury because it simply passed the illegal overcharges on to its customers. *Id.* at 487–88. The Supreme Court rejected this "passing-on" defense, and held that a direct purchaser was entitled to damages regardless of the actual injury. *Id.* at 488.

{26} In *Illinois Brick*, the State of Illinois brought suit as an indirect purchaser against a manufacturer and distributor of concrete block. 431 U.S. at 726. The issue was whether the "pass on" theory "may be used offensively by an indirect purchaser plaintiff against an alleged violator." *Id.* Justice White, writing for the Court as he did in *Hanover Shoe*, declined to construe the federal antitrust laws to allow for indirect purchaser suits. *Id.* at 736. With these two cases, the federal judiciary has decided "that the direct purchaser suit is on balance a more

---

[2] Indirect purchaser causes of action are generally based upon claims that the defendants conspired to fix prices in violation of the antitrust laws. They are indirect in the sense that the plaintiff did not purchase the price-fixed product directly from a defendant but rather purchased the product further down in the distribution chain or purchased a product in which the price-fixed product was either used as a component or consumed in the manufacturing process.

effective instrument for enforcement of the antitrust rule prohibiting price fixing than the indirect purchaser suit." *Crouch v. Crompton Corp.*, 2004 NCBC 7 ¶ 30 (N.C. Super. Ct. Oct. 26, 2004), http://www.ncbusinesscourt.net/OtherRefdocs/2004%20NCBC%207.htm; *see also* William Landes & Richard Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of* Illinois Brick, 46 U. Chi. L. Rev. 602, 634–35 (1979).

4.

## INDIRECT PURCHASER CASES IN STATE COURTS

{27} Dissatisfied with the federal policy, some states enacted new statutes or interpreted existing statutes to allow indirect purchasers to recover under state antitrust laws. *See Crouch*, 2004 NCBC 7 ¶ 31. These state policies favoring indirect purchaser recovery were challenged, but in *California v. ARC America Corp.*, 490 U.S. 93 (1989), the Supreme Court held that states may allow indirect purchaser standing if they so choose. *Id.* at 105–06. As this Court has previously discussed, the differences in the federal and state policies regarding indirect purchasers create a number of problems. *See Adams v. Aventis, S.A.*, 2003 NCBC 7 ¶ 23 (N.C. Super. Ct. Aug. 26, 2003), http://www.ncbusinesscourt.net/opinions/2003%20NCBC%207.htm. Despite these problems, this system of dual enforcement is the law today, and the Court must work within it.

5.

## INDIRECT PURCHASER CASES IN NORTH CAROLINA

{28} The section of North Carolina's General Statutes that gives rise to a number of indirect purchaser cases is 75-16, which states as follows:

> If any person shall be injured or the business of any person, firm, or corporation shall be broken up, destroyed, or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm, or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

N.C. Gen. Stat. § 75-16 (2005). In *Hyde v. Abbot Laboratories, Inc.*, 123 N.C. App. 572, 473 S.E.2d 680 (1996), the North Carolina Court of Appeals interpreted section 75-16 to allow

indirect purchasers to sue manufacturers for antitrust violations. *Id.* at 584, 473 S.E.2d at 688. *Hyde* was a class action against manufacturers of infant formula alleging violations of state antitrust laws. *Id.* at 573, 473 S.E.2d at 681. Plaintiffs were consumers who purchased the formula from retailers and distributors. *Id.* at 574, 473 S.E.2d at 681–82. The trial court granted defendants' motion to dismiss for lack of standing, but the Court of Appeals reversed. *Id.* at 584, 473 S.E.2d at 688. Although *Hyde* established indirect purchaser standing in North Carolina, it did not delineate the scope and breadth of standing under the statute. In *Crouch v. Crompton Corp.*, this Court noted several important developments since *Hyde* and set certain boundaries for indirect purchaser standing. The most important of these developments was a 1996 amendment to the North Carolina antitrust statutes revising those provisions to be "internally consistent and consistent with federal antitrust laws." Act of June 3, 1996, ch. 550, 1995 N.C. Sess. Laws 550. This legislative signal required the Court to reconcile the indirect purchaser standing statute with federal standing requirements. *Crouch*, 2004 NCBC 7 ¶ 49.

{29} The leading federal case on standing in cases such as this is *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) (*AGC*). In *AGC*, the United States Supreme Court adopted a five factor standing test. In *Crouch*, this Court modified the *AGC* factors to recognize indirect purchaser standing. *See Crouch*, 2004 NCBC 7 ¶¶ 66–74. Those factors were described in *Crouch* as follows:

> 1. Whether the plaintiff is a consumer or competitor in the allegedly restrained market. This inquiry focuses on the market the alleged restraint was designed to impact and the intent of the actor in engaging in the restraint. One key question is whether the plaintiff claims injury in a market collateral to the market in which the alleged restraint took place. This factor recognizes that the antitrust laws are designed to see that customers in the relevant market get the benefit of price competition. This factor would have supported standing in *Hyde*.
> 2. The directness of the impact on the plaintiff. This factor is modified to eliminate the restriction of *Illinois Brick* against indirect purchaser standing. Being an indirect purchaser does not preclude standing. However, the causal connection between the act and the claimed injury cannot be too remote. Purchasers in the direct chain of distribution are more likely to be able to show sufficiently direct injury than those outside the chain of distribution. Purchasers who buy the product which is the subject of the restraint are more likely to be able to show sufficiently direct injury than those who purchase a product with a component which is the subject of the restraint. Purchasers of products whose manufacture was impacted by the restraint face significant hurdles showing sufficiently direct impact. Within the chain of distribution, the relative positions

9

of the purchaser and the actor can be significant, depending on the length and complexity of the distribution chain. Even though a purchaser is removed from the direct restraint, he or she may still show direct injury. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 478-81 (1982). This factor would have supported standing in *Hyde*.

3.        <u>Whether there exist other indirect purchasers in the distribution chain who are more directly impacted by the alleged violation</u>. The nature of the market is significant here. Courts must look at the nature of the product and the market for the product as well as the chain of distribution to determine the likelihood of direct pass through of the cost of the restraint or inflated price. The nature of the restraint must also be considered. Double recovery among indirect purchasers should be avoided. This factor would have supported standing in *Hyde* where the distribution chain was short.

4.        <u>The speculative nature of the damage claims</u>. As damage claims move from direct to indirect and the distribution chain becomes more complex, the possibility of factors intervening to affect causation and price multiplies, and claims become more speculative. It is appropriate for purposes of determining indirect purchaser standing "to consider whether a claim rests at bottom on some abstract conception or speculative measure of harm." *McCready*, 457 U.S. at 475 n.11. In *McCready* the Court noted that the courts were required to be cautious when dealing with speculative, abstract and impractical damage theories. *Id.* This factor would not have prevented standing in *Hyde*. This factor focuses on sound economic analysis. Important factors would include reliable demand and supply curve studies and sufficient regression analysis to eliminate other factors in pricing.

5.        <u>The risk of duplicative recovery and danger of complex apportionment of damages</u>. While these factors are limited by the General Assembly's creation of indirect purchaser standing, they should not be totally eliminated when considering the state claims. The courts still have the same interest in keeping the scope of a complex antitrust trial within judicially manageable limits. *AGC*, 459 U.S. at 543. The factors are simply taken down a level and the *Hanover Shoe/Illinois Brick* restrictions eliminated. State cases may present apportionment issues which are simply too complex and for which there exists no measure of recovery which is not speculative. It is clear that the General Assembly did not intend that every purchaser in the distribution chain have a right of recovery or that there be duplicative recovery among indirect purchasers. Such an interpretation would be contrary to the clear guidance to follow federal precedent and harmonize state antitrust law with federal law. Rather, it should be clear that the General Assembly intended that those who can show with some degree of certainty that they were directly impacted by the alleged acts in restraint of trade should be able to recover even though they are indirect purchasers. The courts must be cognizant that the problems between direct and indirect purchaser cases replicate themselves in state indirect purchaser cases where there are multiple levels in the distribution chain and multiple distribution chains. There should only be one fund constituting the amount of the alleged overcharge to North Carolina residents, and the courts must guard against multiple liability for

the fund and prejudice to absent victims or non-class members. The complexity of the distribution chain and the variety of consumers in *Bruggers* [*Bruggers v. Eastman Kodak Co.*, 2000 NCBC 3 (N.C. Super. Ct. Mar. 17, 2000), http://www.ncbusinesscourt.net/opinions/2000%20NCBC%203.htm.] highlight the issues this factor would implicate. As the Supreme Court noted in *AGC* and *Illinois Brick*, massive and complex damages litigation undermines the effectiveness of treble damage suits. The poor results obtained in settlement in the North Carolina cases confirms this view.

*Id.* ¶ 73(1)–(5). The application of these factors is a fact-intensive exercise. The relative importance of any single factor may vary considerably from case to case. This Court's decision in *Crouch* was not appealed and no appellate court has addressed the standing question.

6.

ANALYSIS

{30} The Court now turns to the facts of the case at bar. Before applying the *AGC* factors, the Court notes that this case presents the same problems encountered in *Crouch*. *Crouch* involved price fixing of rubber processing chemicals used in the manufacture of automobile tires. *Crouch*, 2004 NCBC 7 ¶ 15. In *Crouch*, the Court faced several problems:

> First, the price-fixed item is a product consumed or altered in the manufacturing process. Accordingly its use will vary with the type of . . . product being made. It may also vary with the nature of the product . . . being used and how it is used in the manufacturing process. Different direct purchasers . . . might use the various [products] in various ways in differing products.

*Id.* at 78. The EPDM at issue here is similar to the rubber processing chemicals in *Crouch*. As noted previously, EPDM is a component of many consumer products. The use of EPDM varies with the type of product being made. Some products, such as roofing material or pond liners, contain a high percentage of EPDM. Others, such as automobiles, have only a small amount of EPDM. As such, the role of EPDM varies with the nature of product being used.

{31} However, this case differs from *Crouch* in the number of consumer products at issue. The only products at issue in *Crouch* were tires, and the Court was able to determine at the motion to dismiss stage that "the recovery per tire sold in North Carolina will be in the range of $0.01 to $0.11." *Id.* ¶ 79. The Court concluded that this "would not represent a meaningful recovery for consumers" and that "the costs associated with litigation and administration of any settlement would far outweigh the benefits to consumers." *Id.* Here, there are multiple consumer products at issue. Plaintiff alleges he purchased EPDM roofing material, pond liner,

and at least one vehicle containing EPDM. (2d Am. Compl. ¶ 35.) The EPDM components in an automobile include "tires, window molding, hoses, and other rubber products." (*Id.* ¶ 36.) It is clear to the Court that EPDM may well be present in hundreds of consumer products, resulting in an enormous class of plaintiffs and many subclasses. Plaintiff does not seek to limit his claims to pond liners or products which might have a substantial component of EPDM. Perhaps the market and damages would be too small to make the case attractive. The Second Amended Complaint seeks to recover for *every* product which was made using EPDM. The Court's ruling is based upon the Second Amended Complaint before it. The costs of litigation and administration of such a settlement far outweigh the benefits to consumers. Indeed, the settlements reached with the Bayer, Dow, and DuPont defendants in this matter demonstrate that recovery on behalf of individual consumers of EPDM would be miniscule and distribution administratively impossible. The funds from these settlements are destined to end up in the hands of the lawyers, a handful of named plaintiffs, and a small number of charities selected by the approving court pursuant to the cy pres doctrine. In no way do these settlement funds compensate North Carolina consumers who purchased products that contained overpriced EPDM. *See infra* Part II.C. As a preliminary matter, the Court thus notes that the challenges here appear to be even greater than those in *Crouch*.

{32} Preliminary considerations aside, the Court must determine whether Plaintiff has standing to pursue this action, and therefore turns to the *AGC* factors as harmonized with North Carolina law in *Crouch*.

a.

THE RELEVANT MARKET

{33} Here the Court must consider "whether the plaintiff claims injury in a market collateral to the market in which the alleged restraint took place." *Crouch*, 2004 NCBC 7 ¶ 73. Recognizing that "[t]he antitrust laws are designed to see that customers in the relevant market get the benefit of price competition," the first step is to identify the "relevant market." In this case, as in *Crouch*, there are two relevant markets. The first is the market for EPDM itself. In this first market, the sellers are EPDM manufacturers and the buyers are manufacturers of products that contain EPDM. For example, an automobile manufacturer may purchase EPDM for use in its cars. Plaintiff is not part of this first market. Rather, Plaintiff is a buyer in a second, collateral market. In this second market, the sellers are manufacturers, distributors, or

12

retailers of products that contain EPDM and the buyers are consumers who purchase these items. In the case of automobile parts or other small component parts of larger products, the consumer is even further removed from the primary sale. As a purchaser at retail of a product that contains EPDM, Plaintiff is in a market at least secondarily affected by the restraint in the original EPDM-only market. The antitrust laws primarily seek to protect buyers in the first market, who are most directly affected by artificially high prices for EPDM. Plaintiff purchased products the price of which may or may not have been influenced by the illegal restraint. Thus, this factor weighs against standing as to most products.

{34} The situation here is similar to that in *Crouch*, where the plaintiff purchased products that contained the price-fixed rubber additive, rather than the rubber additive itself. The Court found that this weighed slightly against standing in *Crouch*. Both *Crouch* and the case at bar are distinguishable from *Hyde*, in which the plaintiff was a participant in the market for baby formula. *See Hyde*, 123 N.C. App. at 574, 473 S.E.2d at 681–82. Although the *Hyde* plaintiffs did not purchase baby formula directly from the manufacturer, they purchased baby formula, not a product comprised of baby formula and a number of other ingredients. For this reason, this factor would have supported standing in *Hyde*. If the product at issue in *Hyde* was an ingredient in baby formula, rather than the formula itself, this first factor would not have supported standing. Since Plaintiff in this case is a participant in a collateral market—the market for products that contain EPDM rather than the market for EPDM itself—this factor works against standing.

b.

DIRECTNESS OF IMPACT

{35} As the Court of Appeals made clear in *Hyde*, being an indirect purchaser in North Carolina does not preclude standing. *See id.* at 584, 473 S.E.2d at 688. In *Crouch*, this Court fashioned a test to determine the scope of indirect purchaser standing and recognized that there is a boundary beyond which claims are too remote. *See Crouch*, 2004 NCBC 7 ¶ 96. This is similar to the concept of proximate cause in the law of torts. *See Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928). The analysis centers on the length and complexity of the distribution chain. *See Crouch*, 2004 NCBC 7 ¶ 73. Furthermore, "[t]he nature of the item can influence the directness of the impact on the price of the end product at retail . . . . The smaller the component, the less likely there will be impact on the final price." *Id.* ¶ 85. In *Crouch*,

however, the Court knew that "the chemicals only comprise 1% of the value of a tire, reducing the likelihood that total final price was significantly affected." *Id.*

{36}   The Court does not have the benefit of such knowledge here.  Plaintiff is not claiming damage based on one product.  Rather, Plaintiff claims damage based on his purchase of roofing material, pond liner, and "at least one vehicle." (2d Am. Compl. ¶ 35.)  The list of products at issue may grow even longer, for "[d]iscovery may reveal that Plaintiff purchased other goods containing Defendants' EPDM, but which are not known to him at this time." (*Id.* ¶ 36.)  The fact that there are multiple products at issue makes analysis of the directness of impact rather difficult.  Some products, such as roofing material or pond liner, contain a high percentage of EPDM.  The price paid for these items is more likely to have been affected by price fixing because EPDM is a significant component.  But other products, such as the vehicle, may contain little EPDM, and their final prices are not as likely to have been influenced by price fixing in the EPDM market.

{37}   The presence of multiple end products also presents the Court with distribution chains of varying length and complexity.  Some products may have relatively short distribution chains.  For example, a chain might run from an EPDM manufacturer to a pond liner manufacturer to the customer.  There is also the potential for long distribution chains.  A longer chain might run from an EPDM manufacturer to a rubber hose manufacturer to a hose distributor to an automobile manufacturer to a retailer, and finally to the customer.

{38}   Given the great number of products, the varying amount of EPDM in those products, and the varying length and complexity of the distribution chains, the Court cannot determine the directness of impact on these facts.  This factor is inconclusive and weighs neither for nor against standing.  But as the Court will discuss later, the complexity inherent in multiple distribution chains weighs against standing. *See infra* Part I.B.6.d & e.

c.

OTHER DIRECT PURCHASERS MORE DIRECTLY IMPACTED

{39}   Examination of this factor is meant to avoid a double recovery.  "State courts should focus this inquiry on whether or not the existence of other indirect purchasers in the chain of distribution gives rise to other claims against the fund representing the amount by which the price of the retail item has been artificially inflated." *Crouch*, 2004 NCBC 7 ¶ 85.  The potential for long distribution chains makes this inquiry easier.  In long distribution chains, there are likely

to be distributors and retailers who may have a claim that they absorbed some or all of the price increase, rather than passing it along to Plaintiff. For example, a retailer who sold pond liners containing EPDM would also be an indirect purchaser (since it did not purchase raw EPDM), but would have a more direct claim than Plaintiff by virtue of its higher position on the distribution chain. The antitrust laws favor recovery on behalf of these purchasers, and their existence increases the likelihood of double recovery if Plaintiff is allowed to recover. Even though no claims have currently been filed on behalf of these distributors and retailers, this factor nevertheless weighs against standing. The Court reached the same conclusion in *Crouch* on similar facts. *See id.* ¶ 85.

d & e.

SPECULATIVE NATURE OF DAMAGE CLAIMS AND COMPLEXITY

{40} Earlier, the Court noted that analysis of the modified *AGC* factors is a fact-intensive exercise and that "different factors might be important in different cases." *Id.* ¶ 74. In this case, the fourth and fifth factors are extremely important and weigh heavily against standing. These factors are interrelated and share an overarching concern for practicality and wise use of judicial resources.

{41} Calculation of damages in this case would be a daunting task. First, Plaintiff would have to establish prices for products containing EPDM both before and after the alleged conspiracy period. However, this process is complicated by the fact that EPDM is only a component in these products. Thus, "a regression analysis would be required to disaggregate any effect of other changes in the manufacturing process for each manufacturer for each product category." *Id.* ¶ 80. It would not be enough to simply establish that cars, roofing material, pond liner, and other products cost more after the alleged conspiracy than before. There are many factors which could cause a price increase in these products—inflation, prices of other inputs, transport costs, product demand, and market conditions just to name a few. Such an analysis would have to be carried out at each link in the distribution chain in order to determine whether the allegedly illegal price increase was borne in whole or in part by consumers such as Plaintiff. Economists would require huge amounts of information before they could embark on such an analysis. Nonparties will almost certainly consider some of this information to be confidential or subject to trade secret protection, resulting in a protracted and contentious discovery process that would burden the Court. Even if the information were readily available, "the demand and supply

15

curves must then be calculated for this myriad of products and suppliers and the prices determined by the intersections of those curves tested against rigorous regression analysis to insure that no external factors affected the pricing and pass through at the manufacturer level." *Id.* ¶ 81. This rigorous economic analysis is necessary to determine whether increased prices were the result of the alleged price fixing, or were the result of some other factor. If, at the end of this process, it is determined that none of the increased price was passed on to the Plaintiff, then there are no damages and there can be no recovery.[3]

{42} The potentially large number of products containing EPDM adds to the complexity. The analysis described above would have to be carried out for each product in order to accurately calculate damages. In *Crouch*, the Court found that carrying out this type of analysis for a single product, tires, "would be a Herculean task and one which the Court believes would not be free from speculation given the enormous number of disaggregating factors to be considered in the process." *Crouch*, 2004 NCBC 7 ¶ 80. The present case, with its multiple products, manufacturers, markets, externalities, and disaggregating factors, would cause even Hercules to question his legendary abilities. Given these variables, the issues surrounding allocation of the alleged price fixing in this case would be enormously complex and would render the results of any economic analysis speculative.

{43} The Court notes again that each case must be analyzed separately. It is not difficult to imagine "other examples where a component, such as a computer chip, is price fixed, and its costs passed through directly to purchasers of the product in which it is incorporated." *Crouch*, 2004 NCBC 7 ¶ 84. In the example, the required economic analysis would be relatively straightforward. But here, it is clear from the pleadings that the analysis would be unmanageably difficult and unreliable. Thus, it is to the benefit of all parties for the Court to rule on standing early in the litigation process, before substantial resources are expended gathering information for an economic analysis that would prove unreliable in the end.

{44} Considering all factors, Plaintiff lacks standing to pursue indirect purchaser claims. Due to this lack of standing, the law will not grant him relief. Accordingly, Plaintiff's claims against the moving Defendants are subject to dismissal under Rule 12(b)(6).

---

[3] This is similar to the "loss causation" requirement found in the federal securities laws, which itself is rooted in the common law of torts. *See, e.g.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (noting "Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss").

II.

PLAINTIFF'S MOTIONS FOR LEAVE TO DISMISS CERTAIN DEFENDANTS

{45} Plaintiff moves for leave to voluntarily dismiss the Bayer, Dow, and DuPont defendants under Rule 41(a). These defendants are parties to EPDM antitrust lawsuits in other states and have entered into a multistate settlement agreement which Plaintiff contends includes resolution of all claims asserted in the litigation before this Court. Settlements as to both the Bayer and the Dow and DuPont Defendants were approved by the Honorable John McAfee, Circuit Court Judge for Claiborne County, Tennessee.

A.

PLAINTIFF'S MOTION FOR LEAVE TO DISMISS WITH PREJUDICE DEFENDANTS BAYER CORPORATION, BAYER MATERIALSCIENCE, LLC, AND BAYER AG

{46} Plaintiff moves to dismiss Defendants Bayer Corporation, Bayer MaterialScience, LLC, and Bayer AG (collectively "Bayer defendants") pursuant to Rule 41(a) of the North Carolina Rules of Civil Procedure, subject to Rule 23(c), which requires court approval of the dismissal or compromise of a class action. Claims against the Bayer defendants have been compromised and settled for $2,250,000 as part of a multistate settlement agreement. Plaintiffs and Bayer AG submitted the multistate settlement, along with three others, to the Honorable John McAfee, Circuit Judge of Claiborne County, Tennessee. On March 3, 2006, Judge McAfee approved the settlement, which "provides for a fluid recovery or cy pres distribution in lieu of a claims-made process." (Order ¶ 11, Mar. 3, 2006.) The following amounts were deducted from the gross settlement amount:

$818,500 – Attorney fees and expenses for Plaintiffs' counsel

$55,303 – Notice costs

$14,500 – Incentive payments to named plaintiffs

This left $1,361,696.30 plus interest available for cy pres distribution.

{47} On May 15, 2006, Judge McAfee entered a Corrected Supplemental Order consolidating the settlement funds from the four settlements and approving the following cy pres awards:

$700,000 – East Tennessee Children's Hospital of Knoxville, Tennessee

$700,000 – Special Operations Warrior Foundation of Tampa, Florida

17

$250,000 – Baker Cancer Center of Harrogate, Tennessee

$1,400,000 – St. Jude Children's Research Hospital of Memphis, Tennessee

These payments were to be made from the consolidated settlement funds, which included the $2,250,000 Bayer settlement.

B.

PLAINTIFF'S MOTION TO DISMISS DEFENDANTS DOW CHEMICAL COMPANY, E.I DUPONT DE NEMOURS & COMPANY and DUPONT DOW ELASTOMERS, LLC

{48} Plaintiff also moves to dismiss Defendants Dow Chemical Company, E.I. DuPont de Nemours & Company, and DuPont Dow Elastomers, LLC (collectively "Dow/DuPont Defendants") under Rule 41(a) and subject to Rule 23(c). These claims have been settled for $2,000,000 as part of a multistate settlement agreement. On June 21, 2005, Judge McAfee approved the settlement. The following amounts were deducted from the gross settlement amount:

$746,771.26 – Attorney fees and expenses for Plaintiffs' counsel

$101,000.00 – Notice Costs

$6,000.00 – Incentive payments for named plaintiffs

This left $1,156,982.15 available for cy pres distribution. On July 1, 2005, Judge McAfee entered a Supplemental Order approving the following cy pres awards:

$800,000.00 - Special Operations Warrior Foundation of Tampa, Florida

$356,982.15 - East Tennessee Children's Hospital of Knoxville, Tennessee

C.

ANALYSIS

{49} In considering these motions, the Court is mindful of the clear public policy of this state regarding unpaid residuals in class action litigation. The General Assembly codified this policy in section 1-267.10 of the General Statutes, which states as follows:

> It is the intent of the General Assembly to ensure that the unpaid residuals in class action litigation are distributed, to the extent possible, in a manner designed either to further the purposes of the underlying causes of action or to promote justice for all citizens of this State. The General Assembly finds that the use of funds collected by the State courts pursuant to this section for these purposes is in the public interest, is a proper use of the funds, and is consistent with essential public and governmental purposes.

N.C. Gen. Stat. § 1-267.10(a)(2005). The statute goes on to require the parties to report to the court the total amount actually paid to class members. After receiving this report, the court "shall direct the defendant to pay the sum of the unpaid residue, to be divided and credited equally, to the Indigent Person's Attorney Fund and to the North Carolina State Bar for the provision of civil legal services for indigents." *Id.* § 1-267.10(b). Although the statute does not directly address cy pres distributions in which there are no payments made to class members, the Court believes the public policy regarding unpaid residuals is also applicable to cy pres distributions which have no relationship with the class victimized by the violations. Indeed, the citizens of North Carolina are at even greater risk of injustice in nationwide cy pres settlements than they are when there is money left over after class members have been paid. When cy pres distributions are approved by judges sitting in distant jurisdictions, there is an acute danger that the settlement funds will not "further the purposes of the underlying causes of action or . . . promote justice for all citizens" of North Carolina. *See id.* § 1-267.10(a).

{50} The term "cy pres" is most commonly associated with trust law. It "appears to derive from the Norman-French term '*cy pres comme possible*,' meaning 'as near as possible.'" Susan Beth Farmer, *More Lessons from the Laboratories: Cy Pres Distributions in Parens Patriae Antitrist Actions Brought by State Attorneys General*, 68 Fordham L. Rev. 361, 406 n.212 (1999). In trust law, "[c]y pres is a rule of construction which courts employ to carry out the spirit of a trust's terms when literal application of such terms is not feasible." *Id.* An example of the proper application of the cy pres concept in North Carolina can be found in *Board of Trustees v. Heirs of Prince*, 311 N.C. 644, 319 S.E.2d 239 (1984). In that case, the testatrix bequeathed her residuary estate in trust to the University of North Carolina at Chapel Hill for the purpose of building a theatre. *Id.* at 649, 319 S.E.2d at 243. When the University eventually built a new theater, it used funds from the General Assembly instead of the trust funds. *Id.* at 654, 319 S.E.2d at 654. The Supreme Court affirmed an order of the trial court amending the trust to provide for "activities that enhance the production, development, maintenance, and student participation in theatrical productions" at the University, reasoning that this amendment carried out Mrs. Prince's general charitable intent to promote dramatic art. *Id.* at 656, 319 S.E.2d at 247.

{51} In the context of class actions, "[c]ourts have utilized cy pres distributions where class members are difficult to identify, or where they change constantly, or where there are unclaimed funds. In these cases, the court, guided by the parties' original purpose, directs that the

19

unclaimed funds be distributed for the indirect prospective benefit of the class." 3 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 10:16, at 513 n.1 (4th ed. 2002).

{52} The cy pres distributions here are all going to respectable medical or charitable organizations. However, the injured class in this case consists of consumers who were overcharged for a variety of products as the result of an alleged conspiracy between manufacturers of synthetic rubber. The funds distributed are in no way "for the indirect prospective benefit of the class." Such distributions are contrary to the very definition of "cy pres." The National Association of Consumer Advocates suggests that "[c]lass counsel should recommend cy pres remedies which will provide indirect benefit to absent members of the class or which will further the purposes of the underlying litigation." Nat'l Ass'n of Consumer Advocates, *Standards and Guidelines for Litigating and Settling Consumer Class Actions* § 7.C., at 32 (rev. 2006), *available at* http://www.naca.net/_assets/media/RevisedGuidelines.pdf. The purpose of this litigation was to protect consumers from collusion among manufacturers. The organizations receiving funds from these settlements engage in many praiseworthy activities for the benefit of the sick and injured, but they do not work to protect consumers. The distribution of these settlement funds is clearly not "as near as possible" to the purposes of the litigation or the benefit of class members.

{53} In this case, the settlements approved by Judge McAfee are prima facie evidence of the fact that there can be no administratively economical distribution to the class and that the cy pres distribution will result in less than fifty percent of the settlement being distributed to anyone in need. Of that amount, there is no demonstrable showing that any citizen of North Carolina will benefit and a clear indication that citizens of states which do not have indirect purchaser statutes (a majority) will benefit as much as, if not more than, citizens of states that recognize such causes of action. Approximately $150,000 will be spent on "notices" to tell class members who probably will never recognize that they are class members that they will receive nothing from the settlement.

{54} The indirect purchaser cases present a real contradiction. Usually the defendants have been charged with or pleaded guilty to a federal antitrust violation. They are not entitled to any sympathy. The nature of the cases makes proof and defense practically or economically impossible. The Court is not aware of any indirect purchaser case ever being tried in North Carolina, or nationally for that matter. Settlement is virtually certain. Because the individual

class members' damages are usually so small that administration of distribution of a fund is impossible or impractical, a cy pres settlement is the norm. This case is a classic example. Since the states with indirect purchaser standing are limited, defendants want them all settled at once. Plaintiffs' counsel are happy to agree as the settlement fund from which they claim a fee is larger. Simultaneous settlement ensures that multistate distributions to individuals are practically impossible. That leads to forum shopping to get a nationwide class action settlement approved. The parties have a common interest in making the selected judge happy.

{55} These motions present the flip side of the coin if there is no standing requirement for indirect purchaser cases in North Carolina. In the event there is no standing requirement, most cases will involve individual clams for which it would be impossible to economically distribute small sums to consumers. These cases will result in cy pres distributions such as those proposed in this case. The economics of litigation dictate that defendants resolve all the individual state litigation at one time. Hence, there has developed the practice of counsel for plaintiffs and defendants choosing a state where they can get court approval of a nationwide settlement that encompasses claims from all states which recognize indirect purchaser status. Such distributions have the salutary benefit of not permitting the guilty price fixer to escape from paying state law claims in addition to the direct claims for which they are liable under federal law. The question raised in light of the realities of this kind of litigation is what responsibilities lawyers for the North Carolina class and North Carolina judges have to see that these "nationwide" settlements are fair to North Carolinians.

{56} Here the parties chose Tennessee.[4] The reason for that selection is not obvious from the facts of the case. It is obvious that local institutions in Tennessee will benefit disproportionately to other states. It is arguable that some North Carolina residents may go to St. Jude's Children's Hospital for treatment and that some North Carolina residents may receive scholarships from the Special Operations Warrior Fund. All the recipients are worthy charities, and the Court is sure Judge McAfee was conscientious in his selection.

{57} The Court has reached two conclusions based upon its experience with these cases. First, if a nationwide settlement is approved in another state, it is unlikely that North Carolina residents will benefit in any significant way and the public policy embodied in section 1-267.10

---

[4] In another case pending before this Court the parties selected New Mexico. *See Thai Holding of Charlotte, Inc. v. Archer Daniels Midland Co.*, No. 03 CVS 15096 (N.C. Super. Ct. Sept. 3, 2003). The use of nationwide class action settlements presided over by state judges can be troublesome. *See infra* ¶ 60.

will be ignored. Local judges selected by the lawyers get to decide where the cy pres money goes.

{58} Second, no money goes to people who have allegedly been injured. The lawyers benefit directly, and the fees and expenses often consume fifty percent of the settlement funds. Indirect purchaser cases have become a means of generating legal fees without any corresponding value to the persons allegedly injured. If we are to punish those who are guilty of antitrust violations, it seems appropriate that the funds generated by such suits be distributed to victims, a fund they have a connection to, or at least in a manner consistent with the established public policy set by the Legislature. This settlement distributes funds in a manner totally unrelated to the alleged victims and without regard to North Carolina public policy.

{59} This area of the law is in serious need of attention. The appellate courts may find that there is no standing requirement. If so, some guidance to trial judges about their obligations to protect the public from settlements that only benefit the lawyers and the citizens of other states would be useful. This Court has attempted to discern the public policy indicated by the Legislature in section 1-267.10 in a manner to make the settlement of North Carolina claims comport with North Carolina public policy. The Legislature itself could clarify the situation by amending the statute to make clear that if injured persons do not receive any distribution, cy pres funds, whether generated by state or nationwide settlement, should be dispersed to a fund with some beneficial relationship to the victims or as a default as directed in the statute. Judges should not be making those decisions. As the *Financial Times* noted in an article critical of cy pres class action settlements, "[g]overnments, Legislatures and elected representatives should look after society as a whole; courts and lawyers should stick to the task of compensating victims." Patti Waldmeir, *Charitable Giveaway That Cheats Justice: Microsoft's Offer to Settle a Legal Case by Giving Computers to Poor Children Illustrates a Disturbing Tendency for US Courts to Assume the Role of Social Policy Arbiters*, Fin. Times, Nov. 29, 2001, at 19.

{60} The dangers inherent in and problems created when the parties join in selection of one state forum for settlement of nationwide claims underlie the rationale for the federal Class Action Fairness Act. *See* Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.); *see also* Anna Andreeva, Comment, *Class Action Fairness Act of 2005: The Eight-Year Saga Is Finally Over*, 59 U. Miami L. Rev. 385, 393–94 (2005) (describing congressional concern with forum shopping in class action litigation). One need only

look at the outcome for North Carolina residents of *Moody v. Sears, Roebuck & Co.*, 2007 NCBC 13 (N.C. Super. Ct. May 7, 2007), to see the impact locally. *Moody* involved a nationwide class action settlement administered in Illinois in which North Carolina citizens received a total of $66 in cash and coupons and the entire nationwide class received cash and coupons totaling only $2,402, while the lawyers got close to a million dollars in cash. *Id.* ¶ 2. North Carolina courts should not abdicate to judges in foreign jurisdictions the determination of cy pres distributions of settlement funds which belong in part to North Carolina residents and should ensure that North Carolina public policy is followed. The even more difficult question is whether the North Carolina courts should permit dismissal of North Carolina class actions where, as here, no allocation of damages has been made among the states having indirect purchase standing. It can be done. *See Thai Holding of Charlotte, Inc. v. Archer Daniels Midland Co.*, 2001 NCBC 11 (N.C. Super. Ct. May 7, 2007).

{61} The message from this decision should be clear. If North Carolina lawyers and class representatives undertake the representation of North Carolina citizens, they must ensure that the state's interests and the interests of its injured citizens come first. North Carolina courts will and should be reluctant to approve dismissal of any purported North Carolina class action where the North Carolina share of the settlement proceeds is not disbursed to its injured citizens or for their benefit in a cy pres fund related to North Carolina victims or in conformity with the public policy established in section 1-267.10. That is especially true where North Carolina is in the minority of states which recognize indirect purchaser standing.

{62} Class representatives and class counsel should see that (1) a fair share of damages is allocated to North Carolina, (2) victims receive damages if possible, (3) cy pres funds bear some relation to the class of victims, or (4) the North Carolina funds are distributed in accordance with section 1-267.10. At least in the fallback position, the statute promotes access to the court system by North Carolina citizens.

{63} This Court reluctantly approves the dismissal of this action. It does so because it has held that there is no standing and therefore no reason not to approve the payment of funds by the other defendants. Neither Mr. Teague nor his counsel have adequately represented the class in this action. Had they secured a settlement that distributed funds to North Carolina victims of the alleged violation or secured a cy pres distribution in conformity with the interests of the North

23

Carolina class or North Carolina public policy as embodied in section 1-267.10 they would have fulfilled their obligation even if it was in the context of a multistate settlement.

{64} The Court hopes that in the future class counsel will become more attuned to the interests of the class members and that either the appellate courts or the Legislature will bring some rationality to a flawed process.

III.

CONCLUSION

{65} Based upon the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1. Defendants' motion to dismiss is GRANTED. Plaintiff's complaint against Defendants Crompton Corporation, Uniroyal Chemical Company, DSM Copolymer, Inc., DSM Elastomers Europe, B.V., and ExxonMobil Chemical Company is hereby dismissed.

2. Plaintiff's Motion for Leave to Dismiss with Prejudice Defendants Bayer Corporation, Bayer MaterialScience, LLC, and Bayer AG is GRANTED.

3. Plaintiff's Motion to Dismiss Defendants Dow Chemical Company, E.I. DuPont De Nemours & Company and DuPont Dow Elastomers, LLC is GRANTED.

4. Within sixty days from the date of entry of this Order, Plaintiff's counsel shall file with the Court an affidavit showing publication on two successive Sundays of a legal notice in the *Citizen-Times* of Asheville and *The News & Observer* of Raleigh. The notice published in these newspapers shall be four columns wide and printed in ten-point font. The notice shall detail the following:

   a. The total amount of the settlement.

   b. The recipients of the settlement distribution.

   c. The benefit to North Carolina class members.

   d. The amount of fees and expenses paid to counsel representing the North Carolina class.

   e. The total amount of fees paid to class counsel.

   f. The costs of notice and other administrative expenses.

IT IS SO ORDERED, this the 7th day of May, 2007.