Moody v. Sears, Roebuck & Co., 2007 NCBC 13

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
02 CVS 4892

WILLIAM MOODY, JR., on behalf
himself and others similarly situated,

Plaintiff,

v.

SEARS, ROEBUCK AND CO.,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

ORDER AND OPINION

Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.
Louis D. Brandeis, *Other People's Money and How the Bankers Use It*

{1}   This case arises out of Plaintiff's suit for damages based on Defendant's pricing of automotive wheel alignment procedures. This matter is before the Court as a result of the actions of the class representative, William Moody, Jr. ("Moody"), his counsel Gary K. Shipman ("Shipman") and Defendant Sears, Roebuck & Co. ("Sears"). Plaintiff and Defendant filed a Stipulation of Voluntary Dismissal with Prejudice in this purported North Carolina class action without seeking leave of Court as required by North Carolina Rule of Civil Procedure 23(c). Thereafter, this Court required both Plaintiff and Defendant to file an accounting with the Court detailing the settlement and distributions to class members, specifically North Carolina class members, resulting from a nationwide class action settlement approved by the Honorable Julia M. Nowicki of the Circuit Court of Cook County, Illinois. By various procedural devices detailed below, the parties sought to avoid the filing of an accounting. They were unsuccessful in their efforts. This order follows receipt and review of that accounting, which is attached as Appendix A.

{2}   Class representative Moody has received an award of $500 for representing both the North Carolina class in this action and the nationwide class. His counsel has shared in an

1

original fee award of $1,050,000 in cash and $50,000 in coupons for a total of **$1,100,000**[1]. As a result of their efforts on behalf of class members, North Carolina class members received **$66** in cash and coupons and the entire nationwide class received **$2,402** in cash and coupons. The distributions were the result of a nationwide settlement approved by Judge Nowicki. This Court learned of the glaring disparity between the fees and class benefits only after the efforts of Moody and Sears to keep the information secret were unsuccessful. Their efforts to keep the results secret are understandable. The shocking incongruity between class benefit and the fees afforded counsel and the representative leave the appearance of collusion and cannot help but tarnish the public perception of the legal profession. Nor does it appear that Sears is overly concerned with protection of consumers who shop at its stores. This Court will not put its stamp of approval on such an outcome. The case vividly demonstrates the reasons why our rules require court approval before dismissal of a class action, especially where North Carolina class representatives and their lawyers go out of state to settle the claims of North Carolina residents.

{3} For the reasons set forth below, the Court (1) DENIES Defendant's Motion to Vacate Orders Entered After December 16, 2004, (2) dismisses Moody's personal claims WITH PREJUDICE, and (3) dismisses the class action allegations WITHOUT PREJUDICE on the grounds that (1) the Illinois judgment was based on misinformation, (2) the notice plan did not comport with due process standards, and (3) absent class members were inadequately represented.

*Shipman & Wright, L.L.P. by Gary K. Shipman and William G. Wright for Plaintiff.*[2]

*Womble Carlyle Sandridge & Rice by Pressly M. Millen; McCarter & English, LLP by David R. Kott and Edward J. Fanning, Jr. for Defendant.*

Tennille, Judge.

---

[1] As will appear later, after this Court raised questions about the settlement, Plaintiffs' counsel and Sears agreed with Judge Nowicki that Plaintiffs' counsel would make a $100,000 donation to a cy pres fund and forgo their right to the coupons and that Sears would make a $50,000 cash contribution to the same cy pres fund in lieu of the coupons to be given counsel. *See* Letter from Samera S. Ludwig, Class Counsel, to the Honorable Julia M. Nowicki, Circuit Court of Cook County, Illinois (October 27, 2005) (included in Appendix C). The Court does not know which charity was selected but presumes the contributions have been made. The Court is without information from which it could determine if the cy pres distribution benefited the class, even indirectly.

[2] Mr. Shipman was lead counsel for the nationwide class. The following attorneys represented the plaintiffs in the Illinois cases but did not enter appearances in North Carolina: Giebel, Gilbert, Williams & Kohl by Kent Williams; Allan Kanner & Associates, P.C. by Allan Kanner and Cynthia S. Green; Lynch Martin by John E. Keefe, Jr., Patrick J. Bartels, and Stephen T. Sullivan, Jr.; Much Shelist Freed Denenberg Ament & Rubenstein, P.C. by Michael B. Hyman; Law Office of John S. Xydakis by John S. Xydakis.

## I.

## PROCEDURAL BACKGROUND

{4} This action was filed in New Hanover County Superior Court on December 20, 2002. Defendant filed a motion to dismiss on May 5, 2003. The matter was designated a complex business case and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of North Carolina dated December 14, 2003.

{5} Plaintiff filed an amended class action complaint on January 6, 2004. Defendant filed a motion to dismiss the amended complaint on February 16, 2004.

{6} The motion to dismiss was briefed and oral argument heard. Before a decision was rendered, the parties informed the Court that they were negotiating a settlement and the Court withheld ruling.

{7} On November 3, 2004, Defendant filed a status report pursuant to this Court's request of October 22, 2004. Attached as an exhibit to this report was an Order for Preliminary Approval of Settlement entered September 14, 2004 by Judge Nowicki in *Wrobel v. Sears, Roebuck & Co.*, No. 02 CH 23058 (Ill. Cir. Ct. Dec. 24, 2002), identified as a companion case to this action. The status report informed this Court of a hearing scheduled for November 17, 2004 on final settlement approval in *Wrobel.* Judge Nowicki's order referenced a settlement agreement dated September 8, 2004 "intended to resolve this litigation pending in North Carolina . . . ." Order for Preliminary Approval of Settlement at 1, *Wrobel v. Sears, Roebuck & Co.*, No. 02 CH 23058 (Ill. Cir. Ct. Sept. 14, 2004).

{8} This Court's order of November 3, 2004 directed counsel for Plaintiff and Defendant to: 1) submit to the Court a copy of the settlement agreement submitted to Judge Nowicki, 2) provide the Court with copies of all pleadings and communication with the *Wrobel* court, 3) explain why the settlement agreement in a North Carolina litigation was presented in Cook County, Illinois, and 4) explain why this Court was not previously apprised of these actions.

{9} On December 16, 2004, Judge Nowicki entered an Order and Judgment Granting Final Approval of Settlement. This order purported to resolve the North Carolina action along with two Illinois cases.

3

{10} Plaintiff and Defendant filed a stipulation of voluntary dismissal with prejudice on December 29, 2004. On January 4, 2005 the Court denied a dismissal without court approval. On January 19, 2005, the Court tentatively approved the voluntary dismissal subject to Plaintiff and Defendant filing a final accounting providing details of claims and benefits, including total benefits to North Carolina claimants, administrative costs, and fees and expenses to Plaintiff's counsel.

{11} On February 1, 2005, the Court entered an order extending the time for full compliance with the order dated January 19. On February 2 the Court entered an order for an accounting to be provided to the Court thirty days from the closing of the claims period. Defendant filed on February 11, 2005 a motion to dismiss and to vacate orders entered after December 16, 2004, the date of Judge Nowicki's order and judgment granting final approval of settlement in *Wrobel*. The Court entered on March 4, 2005 an order and notice of hearing on Defendant's motion to dismiss.

{12} In response, on March 9, 2005 Plaintiff filed with the North Carolina Court of Appeals a petition for writ of mandamus, writ of prohibition, writ of supersedeas and motion for temporary stay. On March 10, 2005, Defendant filed a motion to stay proceedings and enforcement of all orders until the Court should decide Sears' pending motion to vacate orders and to dismiss action based on the Court's lack of jurisdiction under the Full Faith and Credit Clause of the United States Constitution. The petition and motions to vacate were designed to prevent the Court from obtaining the accounting it had ordered. The court in Illinois had not required and the parties had not filed any accounting showing the results of the settlement. On March 29, 2005, the undersigned, through the Office of the Attorney General, filed a response to the Court of Appeals to Plaintiff's petitions for writ of mandamus, writ of prohibition, writ of supersedeas and motion for temporary stay—asserting that each should be denied for failure to comply with the North Carolina Rules of Appellate Procedure and failure to establish a basis for the remedies sought. The appellate court entered an order on April 5, 2005 denying Plaintiff's petitions in all respects and dissolving the temporary stay previously granted.

{13} On April 21, 2005 this Court issued an order denying Defendant's request by letter that the Court relieve Sears of the obligation to have a representative present at a hearing on April 29, 2005 and requiring the class representative's presence at that hearing.

4

{14} By letter to Judge Nowicki dated May 3, 2005, this Court expressed its concern about the benefits to North Carolina claimants and the nationwide class, fees paid to Plaintiffs' counsel, misrepresentations of Plaintiffs' counsel and complicity from Sears counsel in those misrepresentations. A copy of the Court's letter to Judge Nowicki is attached as Appendix B.

{15} By letter dated May 4, 2005 Judge Nowicki responded to this Court's letter stating that she was considering whether to take action on information provided and that she would keep the Court informed. She followed that with a letter dated November 22, 2005. Copies of Judge Nowicki's letters are attached as Appendix C.

## II.

## FACTUAL BACKGROUND

### A.

### THE PARTIES

{16} Plaintiff William Moody, Jr. is a citizen and resident of Onslow County, North Carolina.

{17} Defendant Sears, Roebuck and Company ("Sears") is a corporation organized and existing under the laws of the State of New York, with its principal place of business located in Hoffman Estates, Illinois. Sears is a wholly owned subsidiary of Sears Holdings Corporation.

### B.

### THE BASIS OF THE COMPLAINT

{18} This action involves automobile wheel alignments. The procedure consists of adjusting a vehicle's wheels so that they are both parallel to each other and perpendicular to the surface of the road. Wheel alignments extend tire life and ensure that a vehicle drives straight along a straight and level roadway. (Compl. ¶ 6.)

{19} There are two types of wheel alignment procedures. The first is a "four-wheel" alignment in which all four wheels are adjusted to align with the geometric centerline of the vehicle. (*Id.* ¶ 8.) A four-wheel alignment can only be performed on vehicles with either front-wheel drive or an independent rear suspension. (*Id.* ¶ 7.) The second type of alignment procedure is a "two-wheel" alignment, in which only the front two wheels are adjusted. A two-wheel alignment is performed on vehicles with rear-wheel drive. (*Id.* ¶ 9.) A four-wheel alignment involves more work and is more expensive than a two-wheel alignment. (*Id.* ¶ 8.)

5

{20} Plaintiff alleges that Defendant sought to take advantage of the price difference between two-wheel and four-wheel alignments by systematically marketing and selling only four-wheel alignments at their Sears Auto Centers across the country. Defendant allegedly charged customers for four-wheel alignments on vehicles for which four-wheel alignments could not be performed. (*Id.* ¶ 13.) Plaintiff took his rear-wheel drive vehicle to a Sears Auto Center in Wilmington, North Carolina on May 30, 2002 and was charged for an "all-wheel alignment." (*Id.* ¶ 16.)

{21} Plaintiff requested an order certifying this case as a class action due to the large number of injured customers and represented that he and his counsel would "fairly and adequately represent the interests of the absent Class Members." (*Id.* ¶¶ 26–27.) Plaintiff contended Defendant's actions constituted unfair and deceptive trade practices in violation of Chapter 75 of the General Statutes of North Carolina. (*Id.* ¶ 37.) The suggested damages included but were not limited to "the difference between the cost of the Defendant's purported four-wheel alignment and a comparable two-wheel alignment." (*Id.* at 13.) Plaintiff also asked that the damages be trebled under section 75-16 of the General Statutes. (*Id.*)

## C.

## THE NATIONWIDE SETTLEMENT

{22} Four days after this action was filed in New Hanover County, North Carolina, the *Wrobel* case was filed in Cook County, Illinois. *Wrobel* also alleged that Sears performed four-wheel alignments for vehicles on which such alignments could not be performed. On September 4, 2004, the Illinois court conditionally certified a nationwide class action and divided the class into two groups. The first group consisted of those charged for a four-wheel alignment or a "difficult" four-wheel alignment in the United States from January 1, 1996 to September 30, 2000 for vehicles not susceptible to four-wheel alignment. The second group consisted of those charged for an all-wheel alignment or "difficult" all-wheel alignment in the United States from October 1, 2000 to September 14, 2004, the date of the Order Granting Preliminary Approval by the Illinois court. The reason for the creation of two groups was Sears' transition from a tiered alignment pricing system to a one price "all-wheel" alignment on or about October 1, 2000. The parties agreed to a settlement for the first group of $10 cash. The parties agreed to a settlement for the second group of a $4 coupon, redeemable at Sears stores nationwide. Sears also agreed to make $500 incentive payments to the named plaintiffs and to pay attorneys' fees and costs in the

amount of $1,050,000 in cash and $50,000 in coupons.[3] The incentive payments, attorneys' fees, and costs were paid separately by Sears. The lawyers and class representatives got their money without regard to the size of the payment to the class.

## D.

## ILLINOIS SETTLEMENT APPROVAL ORDER

{23} The terms of the settlement were incorporated into the Order and Judgment Granting Final Approval of Settlement ("Approval Order"), entered by Judge Nowicki on December 16, 2004. The Approval Order found that the notice plan was the best practicable under the circumstances and fully complied with due process requirements. (Approval Order 4, Dec. 16, 2004.) The Order also found there to be "no evidence of collusion between Sears and Class Counsel." (*Id.* at 8.) Judge Nowicki also stated her belief that "the requested fee amount does not overcompensate class counsel for the work they have performed and expenses advanced in connection with this action." (*Id.* at 12.)

## E.

## THE NEW JERSEY SETTLEMENT

{24} This action was similar to an action filed by the Attorney General of New Jersey against Sears in June of 2003. In that action the Attorney General made the same allegations of deceptive advertising by Sears in connection with wheel alignments. That case was settled in March of 2004. A comparison of the relief obtained by the Attorney General in that case and the results of this settlement are enlightening. In New Jersey, the Attorney General went to great lengths to sift through the records of Sears and specifically identified by name and address **12,544** New Jersey customers who were legitimate class members for the period January 1, 1997 to October 1, 2000. Sears agreed to send a check for $10 to each class member. *See* Appendix D (copy of New Jersey Settlement Agreement). No customer had to file a claim form. No coupons were involved. Sears also agreed to pay cash to any other customer who presented proof of purchase of a wheel alignment during the class period. Thus, the New Jersey action alone produced a class benefit of at least $125,440. After all that work by the Attorney General's office, Sears agreed to pay $500,000 to the Attorney General to be used for consumer protection and to reimburse the Attorney General for his expenses. In contrast, in Illinois, Sears paid twice that amount to class counsel and got a settlement with the **entire rest of the United States** for

---

[3] This amount was later reduced after this Court raised questions about the settlement. *See supra* note 1.

**$2,402.** Compared to the **12,544** citizens of New Jersey who were compensated with cash, **9** citizens of North Carolina were compensated and four of those got four dollar coupons. (Straup Aff. ¶ 8.)

## III.

## APPROVAL OF DISMISSAL OF CLASS ACTION

{25} The Court must approve the compromise or dismissal of this action under Rule 23(c) of the North Carolina Rules of Civil Procedure. The comments to Rule 23 state that section (c) "seems obviously desirable in the protection that it affords absentees." N.C. R. Civ. P. 23 cmt. In this case, the Court approves dismissal of the class action without prejudice. This decision is based on the Court's conclusions that (1) the Illinois Approval Order was based on inaccurate information, (2) the notice plan does not pass muster under the Due Process Clause of the Fourteenth Amendment, and (3) the absent North Carolina class members were inadequately represented by Moody and his counsel.

## A.

## PROBLEMS WITH THE NATIONWIDE SETTLEMENT

## 1.

## ERRONEOUS INFORMATION PROVIDED TO ILLINOIS COURT

{26} Aside from the obvious problems that only 337 valid claims were filed out of a possible class of 1,500,000 (Approval Order 8) and that the class recovery of $66 for nine North Carolina residents was miniscule compared to the attorney fees and expenses paid, there were failures in the process which prevented the citizens of North Carolina who might have been injured from receiving compensation. It is instructive to view what happened here in light of the *Standards and Guidelines for Litigating and Settling Consumer Class Actions* prepared by the National Association of Consumer Advocates.[4] Nat'l Ass'n of Consumer Advocates, *Standards and Guidelines for Litigating and Settling Consumer Class Actions* (rev. 2006), *available at* http://www.naca.net/_assets/media/RevisedGuidelines.pdf [hereinafter *NACA Guidelines*].

{27} The most serious problem with the settlement is that it was based on erroneous information supplied to the Illinois court by counsel for Plaintiffs and acquiesced in by

---

[4] The Court cites the 2006 final version of the Guidelines but notes that the revisions have been proposed since at least 2005.

Defendant's nationwide counsel.[5] Class counsel represented to the court that 1,900 claims had actually been filed by the date of the hearing on preliminary approval. (Fairness Hr'g Tr. 32:17–24, Nov. 17, 2004.) As it turned out, only 997 claims were **ever** filed and of those only 317 were valid claims. Most of the invalid claims were for four-wheel drive vehicles that were not covered by the settlement, and that appeared clearly from the information on the claim form. Thus Plaintiffs' counsel and Sears' counsel knew on the date of the hearing that significantly less than 1,900 valid claims had been filed. Judge Nowicki approved the settlement based on highly inaccurate information about the number of claims. Plaintiffs' counsel concedes that he "misspoke" at the hearing. *See* Letter from Gary K. Shipman, Class Counsel, to the Honorable Julia M. Nowicki, Circuit Court of Cook County, Illinois (May 6, 2005). Neither class counsel nor Defendant's counsel ever did anything to correct the clearly erroneous information given to the court to obtain approval of the settlement. In fact, every effort has been made to hide the facts from the courts. The relevant portion of the exchange between Judge Nowicki and Mr. Shipman at the fairness hearing follows:

> THE COURT: Okay. And when will we know how many claimants we have?
>
> MR. SHIPMAN: Judge, the claim period runs through February of 2005, so I guess the literal answer to your question is that we will know in February of 2005.
>
> THE COURT: **And of course, what happens if only 5 or 10 people respond?**
>
> MR. SHIPMAN: Well, we know so far, Judge—and again, it's summarized in our memorandum in support—as of today, and again, people were only able to make claims starting with the end of the notice period, and the last notice ran October 24th, is that right?
>
> MR. FANNING: Yes, that's right.
>
> MR. SHIPMAN: **As of today, actually as of Friday, there were roughly 1,900 or so people that had already made claims with literally thousands more inquiries in terms of website, calls, et cetera, but there had already been 1,900 or so people that had already submitted claims, and the claim period has only been running roughly three weeks.**
>
> THE COURT: But when's the last notice?
>
> MR. SHIPMAN: October 24th was the last notice.

---

[5] At the hearing in Chicago, Sears' North Carolina counsel, Womble Carlyle Sandridge & Rice, were not present. Sears was represented by McCarter & English, a New Jersey law firm. (*See* Fairness Hr'g Tr. 2:1–3:21, Nov. 17, 2004.) North Carolina counsel continued to represent Sears in its efforts to maintain the secrecy of the settlement outcome.

THE COURT: **Are you expecting a lot of people? I mean I would assume that the inquiries would be closer to the notice than they would be a date further away from the notice.**

MR. SHIPMAN: **Judge, I'm not sure with respect to this settlement that that is necessarily true simply because it's Sears, and Sears' reputation is such that everybody, you know, in a family shops at Sears, and when people make their claims, they'll ask their neighbors, they'll ask their friends, hey, did you hear about this Sears settlement? Here's the information by which you can make a claim, whether they tell their son, tell their mother or their father.[6]**

Now, it certainly statistically is so that a larger number of claims came closer to the period of time in which there's notice, but I think that because we have Sears in this particular case, that my not be the case.

THE COURT: **Well, what if come February we only have 2,000 people, 3,000 people, 5,000 people, so that you are short, what are we going to do?**

MR. SHIPMAN: **Well, I guess it depends on how your Honor defines short. Your Honor knows that it is rare that courts in the United States tie an award of fees to the number of people that have showed up because we can't control that.[7] That's obviously a function of notice, and we can't force people into claims, especially on the lodestar method, and again, we've analyzed this for you in our brief.**

When you're rewarding the lawyers for the time they've got in the case and not necessarily for the "benefit" conferred to class, we think that the analysis should be, I mean have we billed, have we accumulated $1.3 million in time, and again, as an officer of the court, we will confirm that we have in exchange for a payment of $1,050,000 in cash and $50,000 in coupons, **so I understand you Honor's concern, but that's not really going to affect us.**

(Fairness Hr'g Tr. 32:2–34:22 (emphasis added).)

{28} It is significant that the Illinois Approval Order refers not to "claims filed" but "inquiries" made, a clear indication that counsel for Plaintiffs and Defendant were well aware that the judge had been misled at the preliminary approval hearing. (Approval Order 9). It is clear from the record that when the final order was presented to Judge Nowicki in December, only 670 claims had been filed and presumably two-thirds of those were invalid. (*See* Straup Aff. Ex. A.) The reference to "inquiries" in the final order instead of an honest recital about the

---

[6] The Court notes here that only four claims, all invalid, were received from New Hanover County, thus indicating that not even Mr. Moody or Mr. Shipman called any friends or relatives to tell them about the settlement. (*See* Straup Aff. ¶ 9.)

[7] Mr. Shipman is well aware of the fact that this Court is one of the "rare" courts concerned about the number of claimants generated by the notice plan. Class counsel has responsibility for ensuring that the notice plan is effective.

number of actual claims filed was misleading. Thus, the entire settlement approval process was based on erroneous information.

## 2.
## PROBLEMS WITH THE NOTICE PLAN

{29} Equally serious is the failure of the notice plan to meet constitutional due process requirements. Rule 23(c) of the North Carolina Rules of Civil Procedure provides that in class actions, "notice of a proposed dismissal or compromise shall be given to all members of the class in such manner as the judge directs." This is similar to the former Rule 23(e) of the Federal Rules of Civil Procedure, which stated that "notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." As noted below, North Carolina has not revised its Rule 23 in the wake of the 2003 revisions to the federal rule. The current federal rule requires court approval of settlements and dismissals only when there is a certified class, and instructs federal judges to "direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." Fed. R. Civ. P. 23(e)(1)(A)–(B). Since the current North Carolina rule is essentially identical to the former federal rule, the Court looks to cases and materials interpreting the former federal rule for guidance.

{30} Unlike the current or former federal rule, North Carolina Rule 23 does not explicitly require that notice be given to class members after the class action is commenced. Nevertheless, the North Carolina Supreme Court has held that fundamental fairness and due process dictate that adequate notice be given. *Crow v. Citicorp Acceptance Co.*, 319 N.C. 274, 283, 354 S.E.2d 459, 466 (1987). The *Crow* opinion goes on to state that "[t]he trial court should require that the best notice practical under the circumstances be given to class members." *Id.* In some cases, such as this one, settlement is reached prior to class certification, triggering a "higher level of scrutiny in evaluating the fairness of the settlement." 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11:9, at 16 (4th ed. 2002). When no prior notice of the pendency of a class action is given, the notice of settlement must be combined with notice of opportunity for exclusion from the action. *Id.* § 11:30, at 65. Thus the notice given in this case should have had two objectives: (1) to inform the class of the pendency of the action and their opportunity to exclude themselves from it, and (2) to inform the class of their rights under the settlement agreement.

11

{31} All types of notice must satisfy the Constitution's due process standards. These standards "vary in application from case to case, and, accordingly, there is no precise rule for what may constitute notice under all circumstances." 3 Conte & Newberg, *supra*, § 8:18, at 224. Two aspects of notice must be evaluated in light of due process standards: (1) the method of disseminating notice and (2) the content of the notice. A well-distributed yet uninformative notice is as equally useless to potential claimants as a poorly distributed yet informative notice. Unfortunately, the notice in this case was both poorly distributed and uninformative.

a.

## DISSEMINATION OF NOTICE

{32} Clearly the most effective form of notice is direct mailing to individual class members. In *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), the United States Supreme Court held that when the names and addresses of absent parties are easily ascertainable, due process requires individual service by mail. *Id.* at 318. However, individual service is not always required. In certain cases it may be prohibitively expensive or difficult to create a comprehensive mailing list. *Mullane* recognized this problem and noted that individual notice might not be required if names and addresses are not easily ascertainable. *Id.* at 319. An alternate form of notice is notice by publication in a newspaper or other periodical. Notice by publication is doubtless the least effective form of notice. It has been characterized as "an essentially futile gesture." 3 Conte & Newberg, *supra*, § 8:30, at 280. Reflecting on notice by publication, Justice Holmes indicated that "great caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact." *McDonald v. Mabee*, 243 U.S. 90, 91 (1917). In many cases, the contact information for at least some fraction of the class will be easily ascertainable, and due process will be satisfied by a combination of individual notice and notice by publication. *See Lake v. Nationwide Bank*, 156 F.R.D. 615, 629 (E.D. Pa. 1994) (approving a notice plan consisting of mailings to some class members and notice by publication for others); *see also* 3 Conte & Newberg, *supra*, § 8:18, at 225.

{33} Furthermore, mailings and publications are not the only options for dissemination of notice. The Internet can be an effective tool. When an action arises out of events at a particular location, posting notice in that location increases the likelihood that class members will receive notice. An example can be found in the successful notice plan in *Wyatt ex rel. Rawlins v. Sawyer*, 105 F.Supp. 2d 1234 (M.D. Ala. 2000). *Wyatt* was a class action challenging conditions

in the Alabama mental health system. Notices were posted prominently in the living areas of all facilities covered by the settlement. *Id.* at 1240. Notices were also distributed by mail, hand delivery, and newspaper publication in every city housing an affected mental health facility. Mailings and presentations by counsel were made to consumer and advocacy organizations. *Id.* The court approving the *Wyatt* settlement noted that "[t]he adequacy of the notice is reflected, in part, by the substantial number of written responses timely filed before the fairness hearing and by the attendance and participation at the fairness hearing." *Id.*

{34} This Court likewise considers the response rate as evidence of the adequacy of notice. Here, there were only 317 valid claims filed out of a class that counsel projected could be as large as 1,500,000. (*See* Straup Aff. ¶ 7.) **That is a claim rate of 0.000211, or 0.0211%.** Clearly, given the results in this case, the notice plan did not work. Why? It was clearly not the best practical notice and thus was inadequate under due process standards. Sears customers get their wheel alignments done at Sears automotive centers. There were 843 of those nationwide in 2004. Had class counsel insisted that notice and claim forms be placed in those automotive centers where customers would most likely be, the claim rate might have been higher. Point of sale notice would have been far more effective. Having the notice prominently displayed and claim forms available at the checkout counter could have been accomplished with little difficulty or expense. No use was made of Sears' mailing list for credit card holders. An insert to the monthly bills could have been quite effective, thus providing at least some of the class members with individual notice. Instead, Sears got to put a notice in *Parade* magazine on October 17 and 24, 2004, in *USA Weekend* on October 17, and on October 18 in local papers in twenty-five of the supposedly largest markets of Sears in 1999 "for wheel alignment sales." (Eriser Aff. ¶¶ 2, 4.) Strangely, no notice was published in local newspapers in Chicago, Sears' hometown and site of the class action settlement, but notices were published in local newspapers in Wilmington and Raleigh, North Carolina; Hicksville, New York; Danbury, Connecticut; and Mesa, Arizona. Within North Carolina, notices were not published in the local newspapers of Charlotte, Winston-Salem, Asheville, or Greensboro—where this Court sits. The notice plan permitted Sears to carefully avoid notice to its automotive center customers—the most likely class members. Plaintiffs' counsel evidently agreed that five of the sparse twenty-five notices (20%) could be published in New Jersey—a state in which there could be no claimants as a result of the prior suit. (Eriser Aff. Ex. C.) This misuse of a significant percentage of the local newspaper

advertisements demonstrates a lack of concern for use of the best notice practical under the circumstances. The New Jersey settlement shows that customers could be identified with some effort. Plaintiffs' counsel was unwilling to make that effort for North Carolina residents. As a result they got $66 worth of cash and coupons compared to their counterparts in New Jersey who did not even have to file a claim form and got over $125,000 in cash. The notice plan in this case does not meet the due process standards for effective dissemination of notice.

b.

CONTENT OF NOTICE

{35} Even if the notice had been effectively distributed, it would still fail to satisfy due process because of its inadequate content. In addition to defining the standards for dissemination of notice, due process also requires the Court to review the contents of the notice. Neither the federal rule nor the North Carolina rule specify the content of the notice. However, it is clear that the notice must "inform the class members of the nature of the pending action, the general terms of the settlement, that complete and detailed information is available from the court files, and that any class member may appear and be heard at the hearing." 3 Conte & Newberg, *supra*, § 8:32, at 260. The settlement summary should generally include "(1) a statement of the settlement consideration to be paid; (2) a formula for distribution of the settlement fund; and (3) the formula and method for distribution of attorneys' fees and expenses." *Id.* § 8:32, at 264. A notice lacking an indication of the terms of the settlement does not give class members sufficient information on which to act, thus failing to achieve its primary objective. Regarding attorneys' fees, "the notice should at a minimum generally apprise class members that fees will be sought and awarded by the court at the settlement hearing or a subsequent hearing and indicate whether the defendants or the settlement fund will bear such costs." *Id.* § 8:32, at 265.

{36} The notice given here met some of the requirements described above. It informed the class members of the general nature of the case, stated the time and location of the hearing, and indicated where to find more detailed information. Unfortunately any benefit of this scant information was sabotaged by the time frame of the notice and deadline for filing objections and exclusions. Notices were published on October 17, 18, and 24, 2004. The deadline for objecting to the fairness of the settlement or opting out of the action was November 3, 2004. This gave class members only nine days from the date of the final notice to locate the terms of the settlement and decide on a course of action. A more detailed notice than the published summary

14

was available by calling a toll-free number, writing to the claims administrator, or visiting the website, http://www.automotivewheelalignmentsettlement.com. The only viable option given the short time frame was to visit the website. However, a potential claimant would have had to read the published notice in detail to learn about the website. The web address appeared at the bottom of the notice in ordinary type. It was not underlined or in bold as other parts of the notice were. No efforts were made to draw the reader's eye to the web address. Certainly nine days was not enough time to write off for a notice and claim form. Since the published notice did not indicate the terms of the settlement, a potential claimant would not have been able to fully evaluate his options until he reviewed the full notice. If a class member wished to object to the settlement, he had less than nine days to file his notice to appear with the Cook County Clerk of Court and serve it on class and defense counsel—no small task for a layperson who may have been located in Wilmington, North Carolina. Nine days was also little time to complete an exclusion form and return it to the claims administrator.

{37} In addition, the published legal notices provided no information about the coupon nature of part of the settlement or the fact that the attorneys would receive a million dollar cash fee. Nor did it mention the amount to be received by the consumer. The average consumer had no idea whether to object to the settlement because there was no information in the published notice upon which to make a judgment. The Internet site had to be entered exactly as www.automotivewheelalignmentsettlement.com or it could not be reached. There was no mention of or link to the settlement on the Sears website, and the web address above clearly did not refer to Sears by name. The consumer who had to call or write for a claim form only to find that they might get a four dollar coupon was not likely to follow through. Nor were there likely to be objections.[8] No notice was published in the Chicago papers. The last notice was published on October 24, and the fairness hearing was held in Chicago on November 17. No notice was provided to this Court until it was demanded. The *NACA Guidelines* provide:

> Early in the lawsuit, class counsel should also ask the court to order the defendant to get permission from the court before entering into any settlement in another case that would affect the class representative or class members.
>
> ....

---

[8] Ultimately, one objection was filed but withdrawn. (Approval Order 8.)

When a settlement has been reached, counsel should always notify class counsel and the court in other cases involving the same defendant and the same or similar issues. Such notice should occur well before the fairness hearing, leaving enough time to give those counsel the opportunity to appear.

*NACA Guidelines, supra,* § 2.C., at 8–9.

{38} It is hard to imagine a more inadequate notice plan and claims process. The results so demonstrate.

### 3.

### OTHER DEFICIENCIES

{39} The use of coupons of little cash value was also a red flag that this settlement was suspect. Coupons, particularly those of small dollar amounts, are not favored. Again, the NACA Guidelines are instructive. Guideline 4—Certificate Settlements—deals specifically with coupon settlements. It provides in pertinent part:

Certificate settlements have many disadvantages and should be proposed by class counsel only in the rare case . . . .

. . . .

Certificates should have some form of guaranteed cash value. . . .

Certificate settlements should never be proposed to the court unless it is apparent that the defendant is providing greater true value (i.e., not just the face value of the certificates or their potential value) to class members than would be available from an all-cash settlement. . . .

A settlement involving certificates should require a minimum level of redemption by the class members within a reasonable period of time. If actual redemption does not meet this minimum level, the defendant should provide alternative relief in the form of a common fund or, as has been done in some case[s], a second release of additional coupons, perhaps printed in a newspaper as, in effect, a fluid recovery mechanism.

. . . .

Class counsel and defendants should submit to the court and all counsel of record detailed information about redemption rates and coupon transfers during the entire life of the coupon. **By doing so, a public record will be made of what works and what does not work in non-cash settlement cases.**

*Id.* § 4.C., at 20–21 (emphasis added).

{40} None of these salutary guidelines were followed here.

{41} The process was flawed in numerous other ways. There was no monitoring by the court absent questioning from this Court. The preliminary and final orders did not provide that any accounting or report be made to the court in Illinois. Had this Court not insisted upon the accounting it received, the failure of the settlement process would have been hidden forever. It is noteworthy that both Plaintiff's counsel and Defendant's local counsel had appeared in this Court before in class action litigation. Both were aware of this Court's views that counsel fees should be related in some rational way to class benefits received, and both knew of the practices of this Court to monitor the claims process and to have legal notices published at the end of the case so the public can see what the class received, what expenses were incurred, and what fees were awarded to class counsel and the class representative. Perhaps that knowledge led them to decide that this case should be settled elsewhere without notice or review by this Court.

Monitoring is an essential component of the work of class counsel and the court. NACA Guideline 16 recommends:

> All settlements should contain provisions sufficient to allow class counsel to evaluate whether the defendant is complying with settlement terms and, if necessary, to enforce the settlement. When class action cases are resolved by court order, class counsel should seek post-resolution protections for the class to be included in the court order.
>
> . . . .
>
> Information regarding defendants' compliance with settlements or court orders should be compiled into a report, when appropriate. Monitoring reports should detail the efforts the defendant has made to comply with the class settlement or order. These reports should contain enough factual information to permit a monitor or judge to determine independently that the defendant is complying in a timely way with the provisions of the class settlement or order. Monitoring reports also should be filed with the court or otherwise should be available to class members and their counsel upon request.

*Id.* § 16.C., at 69.

{42} It is clear that Plaintiff's counsel had no intention of bringing the failure of the settlement to the attention of any court. He had an obligation as class counsel to do so. Sears' counsel bore a similar responsibility to notify the court about what had happened. All counsel knew from Judge Nowicki's questions at the hearing that she was concerned about the scenario in which there were no claimants. The extreme lengths to which counsel for both parties went to

hide the results is a strong indication of their understanding of how inadequately the class had been represented in this action. The very fact that a lawyer representing a class of North Carolina citizens would seek an order of mandamus from the Court of Appeals to prevent the trial judge responsible for protecting the interest of class members from even seeing the results of the lawyer's representation speaks volumes about his concern over that representation and his lack of concern for class members.

### 4.

### ATTORNEYS' FEES AND ADEQUACY OF REPRESENTATION

{43} In view of the failures in the settlement process, the vast disparity between what the class received and the fee accorded to class counsel—paid by Sears—can do little to enhance the public trust in lawyers or the legal system. NACA Guideline 8 deals with requests for attorney fees. It provides in pertinent part:

> The issue of attorney fees is important in class actions. If awards of attorney fees are too low, attorneys will not have the incentive to undertake, on a contingent basis, representing putative consumer class actions. The public policy goals, which include recovering money for consumers and deterring illegal conduct by defendants, furthered by worthy class actions cannot be achieved without the promise of fair and reasonable fee awards upon success. On the other hand, fee awards that are too high do not serve the best interests of the class members and some such awards have become the rallying point for criticism of class actions in general.

> ....

> The prime focus of criticism is the size of the fees. In many instances, this problem is more apparent than real. For example, when the individual recovery is $50.00 per consumer, an attorneys' fee of $2 million might seem excessive at first glance. But if the total dollars actually recovered by the individual class members in such a case were $15 million, the fees are less than 14 % of the total class recovery. **This makes the fee reasonable with respect to the total recovery, which is the proper comparison.** Criticism focused on a comparison between total fees and individual recoveries are either ill-informed or merely convenient cover for persons who oppose consumer class actions for other reasons.
> But some criticism of excessive fees cannot be so easily dismissed. In particular, compelling criticism has been directed at cases in which the actual cash received by the class is minimal, if any, and the only other benefits received by the individual members are certificates of questionable value. . . .

> ....

18

Reasonable attorney fees must be awarded in consumer class actions so that lawyers are provided sufficient incentive to undertake the substantial risks involved in privately enforcing consumer protection laws. But excessive and unreasonable amounts should be neither sought nor awarded. Ultimate authority over fee awards rests with the court. Nevertheless, NACA firmly believes that class counsel have a special obligation not to submit excessive fee requests because fees—directly or indirectly—reduce the amount otherwise available to class members (except in "pure" fee-shifting situations, where the attorneys' fee is assessed from the defendant, not the class). We recognize that the determination of what is an "excessive" request is often difficult and uncertain. **But this difficulty does *not* mean that a reasonable request equates to whatever a particular court might reward in a procedural context where there may not be adversary briefing on the issue. Obligations to the class and concern for the long-run integrity of the class action system of justice require that class counsel not take undue advantage, even if a court might let it pass.**

. . . .

Before the court can give final approval to a proposed class action settlement, notice must be provided to the class outlining the terms of the settlement. F.R.C.P., Rule 23(e)(1)(B). One of the terms which should always be included in such notice is the maximum amount of attorney fees which class counsel will or may seek as part of the settlement. In a common fund case where a percentage will be sought, that fact and the specific maximum percentage to be requested should be stated in the notice. In statutory fee shifting cases, the lodestar, if agreed to by the parties, should be disclosed in the class notice. If there is no agreement, the amount class counsel intend to request from the court should be disclosed. It is also a good idea to disclose the amount of fees per class member, if that can be easily calculated, even in approximation. For example, the class must be told that the lawyers will seek $2 million in fees, but could also be told that this equates to $6.67 per class member. The average fee per class member need not be disclosed when recoveries vary substantially among class members, since that number would not be meaningful, or in pure statutory fee-shifting contexts, where the amount has not been negotiated in advance as part of the settlement, but instead will be determined by the Court and paid by the defendant.

*Id.* §§ 8.A., C., at 33, 38, 41 (emphasis added).

{44} Doing the math in this case is easy. **For each class member who received a $10 check or a $4 coupon, plaintiffs' counsel received just shy of $3,000.**[9]

{45} Class counsel in this matter has urged the Court to adopt the view that the actual benefit received by the class is irrelevant to a determination of the fairness of the fee and that it is

---

[9] The reduced fee of $950,000 divided by 317 equals $2,996.85.

sufficient that class counsel has created the "opportunity" for class members to file claims and receive settlement proceeds. The Court declines to adopt that standard for a number of reasons. First is the public misperception that our court systems may be permissive of frivolous lawsuits and may be operated to benefit lawyers. Outcomes such as this one fuel such misperceptions. Second, the real benefit to the class is important. Third, class counsel is responsible for ensuring an adequate notice process and a fair and workable claims procedure. Without those, class members are denied the "opportunity" to receive compensation for their injuries. The real test of the adequacy of notice and claims procedures is whether they work. If class counsel failed in their duties, claims will be low. The lower the claims, the greater the indication of failure.[10] Eliminating any consideration of actual benefits paid out would excuse class counsel from doing their job properly. Lastly, and less importantly, a low claim rate may indicate that consumers did not feel that a defendant had done anything wrong and that the lawsuit was frivolous and they had not been injured. Here, it is not clear whether the class ever had a real "opportunity" to receive a settlement or, as consumers, did not feel they had been deceived.

{46} It is indeed ironic that this issue first arose weeks after the President of the United States signed the Class Action Fairness Act of 2005 ("the Act"). The Findings and Purpose section of the Act points out that abuses of class action litigation have undermined public respect for the judicial system. It addresses specifically the situations in which class members receive little or no benefit from class actions, and are sometimes harmed where:

> (A) counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value;
> (B) unjustified awards are made to certain plaintiffs at the expense of class members; and
> (C) confusing notices are published that prevent class members from being able to fully understand and effectively exercise their rights.

Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 2(a)(3)(A)–(C), 119 Stat. 4, 4–5 (2005).

{47} The Act effectively removed most class actions from state courts based on a perception that state courts did not adequately manage, oversee and supervise class actions, thus failing to prevent those abuses and undermining public respect for the judicial system. Our judges should follow the recommendations contained in the RAND Institute for Civil Justice

---

[10] A claim rate of 0.000211 is about as low as you can go.

study of class actions entitled *Class Action Dilemmas: Pursuing Public Goals for Private Gain.* That study concluded:

> But it is judges — by their willingness or unwillingness to certify cases, to approve settlements, and to award fees — who will decide the kinds of cases that will be brought within whatever substantive legal framework emerges. Educating judges to take responsibility for class action outcomes and providing them with more detailed guidance as to how to evaluate settlements and assess attorney fee requests, ensuring that courts have the resources to manage the process and scrutinize outcomes, and opening up the class action process to public scrutiny will not resolve the political disagreement that lies at the heart of the class action controversy. But these actions could go along way toward ensuring that the public goals of damage class actions are not overwhelmed by the private interests of lawyers.

Deborah R. Hensler et al., RAND Inst. for Civil Justice, *Class Action Dilemmas: Pursuing Public Goals for Private Gain* 500 (2000).

{48} The RAND Institute conducted a follow up study on insurance class actions which has just been published. With respect to attorney fees, that study concluded:

> Although our data suggest that mean and median class attorneys' fee and expense award percentages at the time of settlement approval were just under 33 percent (a benchmark commonly used for assessing the reasonableness of attorney compensation in nonclass litigation), the shortcomings observed in the way settlement distributions were completed in some cases effectively resulted in mean and median attorneys' fee and expense percentage of around 50 percent if funds were actually disbursed, rather than simply being theoretically available, are taken into account. In about a quarter of the settlements, attorneys received 75 percent or more of the amount ultimately disbursed to class members, a marked increase over the one-third benchmark. The failure of some insurers to consistently provide full information about settlement outcomes makes generalizing this result problematic, but it does suggest that, in at least some cases, there would have been a wide divergence between what was contemplated at the time the settlement was reviewed and what actually took place. Arguably, the ultimate responsibility for such shortfalls lay at the feet of the judges who approved the particular combinations of class notice and claiming procedures agreed to by defendants with interests in minimizing exposure and the expenses of litigation and by class counsel whose fees are typically based on the theoretical size of the fund and not actual benefit delivery. It is not likely that a settlement approved as being fair, reasonable, and adequate based on the estimated value to class members would have met those same criteria if the aggregate size of the proposed

21

benefits were cut by 87 percent or more, conditions we found in about a quarter of the cases for which we have some outcome information. At the very least, judges should make their decisions to approve settlements in light of realistic proportions of actual disbursements, not the optimistic claims of counsel for both sides. And if such projections are not possible, judges should retain jurisdiction over the case and periodically review the progress of the distribution, perhaps withholding final approval until the bulk of the compensation fund has been distributed to class members or cy pres recipients.

Nicholas M. Pace et al., RAND Inst. for Civil Justice, *Insurance Class Actions in the United States* 106 (2007).

{49} In the view of this Court, the failures of class counsel and the class representative to adhere to the fundamental standards of representation such as those espoused in the *NACA Guidelines* and other authorities quoted above and the attempt to hide the total failure of the notice and claims process rises to the level of inadequate representation. When North Carolina citizens and North Carolina lawyers undertake to represent their fellow citizens they have a duty to protect those citizens—even in a nationwide class action settlement—not hide information from them. When a class action is filed in this state, the courts of this state have a duty to see that even nationwide settlements meet the standards of due process and fundamental fairness. Lawyers representing class members must put the class members' interests ahead of their own personal financial interests and ensure a fair settlement, an adequate notice and a fair claims procedure.

{50} Sears is equally culpable. Corporations like Sears which settle consumer class actions must do so in a fair manner and should not employ notice and claims processes which deprive consumers of knowledge of the settlement terms or the ability to take advantage of the settlement. Sears has displayed a disdain for the interests of its customers.

{51} Class actions are not entrepreneurial activities. They are designed to achieve real redress for class members who have suffered real injuries. That reparation did not occur in this case.

IV.

JURISDICTIONAL ISSUES

22

{52} In its Motion to Dismiss and to Vacate Orders Filed After December 16, 2004, Defendant advanced several arguments as to why this Court lacks continuing jurisdiction over this matter and must dismiss the class action allegations with prejudice. Plaintiff joins in these arguments. The Court will address each issue.

## A.

## FULL FAITH AND CREDIT

{53} The parties argue that the Full Faith and Credit Clause of the U.S. Constitution requires this Court to unconditionally accept Judge Nowicki's Approval Order and dismiss the class action claims with prejudice. The clause states that "[f]ull faith and credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const. art. IV, § 1. The Court notes the importance of the Full Faith and Credit Clause in a federal system such as ours. If states refused to enforce the judgments of other states, serious problems could arise. *See* Richard D. Freer & Wendy Perdue, *Civil Procedure* 26 (3d ed. 2001). The Court also recognizes that mere dissatisfaction with the results of a foreign proceeding is not grounds for denying a judgment full faith and credit. In *Fauntleroy v. Lum*, 210 U.S. 230 (1908), plaintiff and defendant entered into an illegal gambling contract in Mississippi. *Id.* at 233. When defendant refused to pay, plaintiff obtained an arbitration award against him. *Id.* at 234. Plaintiff brought suit on the award in Missouri and prevailed. *Id.* The courts of Mississippi refused to enforce the Missouri judgment, but were reversed by the U.S. Supreme Court. *Id.* at 238.

{54} However, as the North Carolina Supreme Court has noted, "the judgment from the rendering court must be deemed to have satisfied certain requisites of a valid judgment before full faith and credit will be granted to it." *Boyles v. Boyles*, 308 N.C. 488, 491, 302 S.E.2d 790, 793 (1983). In order for a foreign court's judgment to be considered valid, "[t]he rendering court must . . . have respected the demands of due process." *Id.*; *see also* Restatement (Second) of Judgments § 81 (1982). There are many cases in which North Carolina courts have refused to accord full faith and credit to foreign judgments. In *Boyles*, for example, our Supreme Court found that a default judgment entered by a Florida court was not entitled to full faith and credit in North Carolina because the defendant did not receive adequate notice. *Id.* at 499–500, 302 S.E.2d at 798; *see, e.g.*, *Frances Hosiery Mills, Inc. v. Burlington Indus., Inc.*, 285 N.C. 344, 357, 204 S.E.2d 834, 843 (1974) (refusing to extend full faith and credit to a judgment on an

arbitration award obtained in New York); *Donnell v. Howell*, 257 N.C. 175, 187, 125 S.E.2d 448, 457 (1962) (holding that an Alabama divorce decree was not entitled to full faith and credit in North Carolina where facts regarding the parties' residency were misrepresented to the Alabama court).

{55} In class actions, inadequate representation by class counsel is another reason for refusing to extend full faith and credit to a foreign judgment. Absent class members are only bound by a judgment "where they are in fact adequately represented by parties who are present, or where they actually participate in the conduct of the litigation in which members of the class are present as parties." *Hansberry v. Lee*, 311 U.S. 32, 43 (1940); *see also* Geoffrey P. Miller, *Class Action and Jurisdictional Boundaries: Overlapping Class Actions*, 71 N.Y.U. L. Rev. 514, 526 (1996) (noting that "absent class members may be able to collaterally attack a judgment in a class action case if they can show that they were not adequately represented by class counsel in the initial proceeding").

{56} This Court refuses to extend full faith and credit to Judge Nowicki's Approval Order. As explained above, the Order suffers from three major problems. First, it was based on erroneous information provided by counsel. Second, the notice to class members fell short of the standards imposed by due process. Finally, the absent class members were inadequately represented by class counsel in the proceedings before the Illinois court. In light of these deficiencies, the Illinois Approval Order is not entitled to any preclusive effect in North Carolina.

B.

RULE 23(c)

{57} The parties also argue that Rule 23(c) of the North Carolina Rules of Civil Procedure does not require court approval of dismissal of a class action where a class was never certified. Rule 23(c) provides that "[a] class action shall not be dismissed or compromised without the approval of the judge." As explained above, the present federal rule only requires court approval of dismissal where there is a certified class. Fed. R. Civ. P. 23(e)(1)(A). The requirement of a certified class was added to the federal rule in 2003. North Carolina's rule remains unchanged, as it has since 1967. There is no compelling reason for this Court to read the North Carolina rule consistently with the revised federal rule. This state's Rule 23 plainly requires court approval

24

before a class action can be dismissed or compromised, regardless of class certification. This case is no exception. In fact, it demonstrates clearly why the rule is necessary.

{58} The parties also argue that this Court lacks jurisdiction over this matter because no justiciable case or controversy exists after the nationwide settlement. This argument is unavailing. For the reasons stated above, this Court must approve the dismissal of this case under Rule 23(c). The parties may have resolved their differences, but the Court still has a duty to protect absent class members in North Carolina against "the prejudice of discontinuance." 3 Conte & Newberg, *supra*, § 8:18, at 219.

## C.

## DISMISSAL OF MOODY'S INDIVIDUAL CLAIM

{59} Finally, the parties argue that this case must be dismissed because the named Plaintiff has released his claims against Defendant for consideration. The Court need not address this argument in light of its dismissal of Mr. Moody's claims with prejudice.

## IV.

## CONCLUSION

{60} For the foregoing reasons, the Court will exercise its discretion to dismiss Mr. Moody's personal claims with prejudice. He has been adequately compensated for his individual claim, and, given the results of this case, his counsel has been more than adequately compensated by the Illinois court. There is nothing this court can do about that. Because the Court finds that (1) the settlement was approved based upon erroneous information supplied by counsel, (2) the notice procedures in the *Wrobel* case did not meet constitutionally mandated due process, and (3) representation of the class was inadequate, the Court will dismiss the class action allegations **without** prejudice. The Motion to Vacate Orders Entered After December 16, 2004 is denied.

IT IS SO ORDERED, this the 7th day of May, 2007.

# APPENDIX A

STATE OF NORTH CAROLINA

NEW HANOVER COUNTY

IN THE GENERAL OFFICE OF JUSTICE
SUPERIOR COURT DIVISION
NORTH CAROLINA BUSINESS COURT
02 CVS 4892

---

WILLIAM MOODY, JR., on behalf of
himself and all others similarly situated,

Plaintiff,

vs.

SEARS ROEBUCK AND CO.,

Defendant.

: **AFFIDAVIT OF CINDI A. R. STRAUP**

---

STATE OF TEXAS )
) ss:
COUNTY OF DALLAS )

CINDI A. R. STRAUP, of full age, being duly sworn according to law, upon her oath deposes and says:

1. I am employed by LECG and have been employed by LECG since October 2002. My current title is Director and in that capacity I have served as project operations manager for multiple claims processing, class action and mass tort engagements. I have over eighteen years of claims administration and financial services industry experience.

2. I am authorized to make this affidavit on behalf of LECG, and the information provided in this affidavit is given upon my personal knowledge and through my contact with other employees of LECG.

3. LECG is a global expert services firm. Among the many services it performs is complex claims management. LECG provides a full range of claims management

1

and class action settlement services, from media campaigns and noticing, to the distribution of settlement proceeds and final reporting.

4. LECG serves as the claims administrator with regard to the national class action settlement of Wrobel v. Sears, Roebuck and Co., Circuit Court of Cook County, Illinois, Civil Action No. 02-CH-23058, and the related cases: Skurman v. Sears, Roebuck & Co., Circuit Court of Cook County, Illinois, Civil Action No. 02-CH-18740 and Moody v. Sears, Roebuck & Co., North Carolina Business Court, New Hanover County, Civil Action No. 02 CVS 4892 (hereinafter "the Settlement"). I am personally involved in the administration of these claims.

5. LECG has no business affiliation with defendant Sears, Roebuck and Co.

6. A total of 1,015 claims have been filed with respect to the Settlement.

7. While no claims have been paid to date, there are 189 Group 1 claims (by "four-wheel alignment" or "difficult four-wheel alignment" customers) that are eligible for a $10 check and 128 Group 2 claims (by "all-wheel alignment" or "difficult all-wheel alignment" customers) that are eligible for a $4 coupon.

8. Of the claims filed, 40 correspond to a mailing address in North Carolina. Nine (9) of the North Carolina claims are complete and eligible for benefits under the Settlement Agreement – five (5) Group 1 claims and four (4) Group 2 claims.

9. Based on the claimant's mailing address, Hanover County, North Carolina accounts for four (4) of the claims filed. None of these claims are eligible for benefits.

10. Assuming payment of all eligible claims, the benefit distributed to the class would total $2,402 in value. The benefit that would be distributed to North Carolina claimants would total $66 in value.

2

11.   LECG produces a monthly status report for counsel's review.  A true and correct

copy of the Status Report as of March 31, 2005 is attached hereto as Exhibit A.

12.   Through March, 2005, administration costs, including fees and expenses, have

amounted to $65,656.31.

CINDI A. R. STRAUP

Sworn and subscribed to before me
This 22nd day of April, 2005

NWK2: 1310177.01

3

Exhibit A



## Sears Automotive Wheel Alignment Settlement Center
## Status Report
## Claim Form Bar Date - 02/21/05
## As of March 31, 2005

| Report No. | Period Ending | Calls to IVR | Voicemails Received | Claim Forms Received | Website Statistics |
|---|---|---|---|---|---|
| 1 | November 30, 2004 | 1,235 | 846 | 339 | 809 |
| 2 | December 31, 2004 | 64 | 48 | 329 | 194 |
| 3 | January 21, 2005 | 33 | 18 | 146 | 69 |
| 4 | February 28, 2005 | 81 | 30 | 183 | 100 |
| 5 | March 31, 2005 | 83 | 11 | 18 | 112 |
| | Total | 1,496 | 953 | 1,015 | 1,284 |

# APPENDIX B



# STATE OF NORTH CAROLINA

Ben F. Tennille
Special Superior Court Judge
For Complex Business Cases

## GENERAL COURT OF JUSTICE
### SUPERIOR COURT DIVISION
### NORTH CAROLINA BUSINESS COURT

200 S. Elm Street, Suite 200
Greensboro, N. C. 27401
Telephone: (336) 334-5252
Facsimile: (336) 334-5162
info@ncbusinesscourt.net

May 3, 2005

The Honorable Julia M. Nowicki
Circuit Court of Cook County
Richard J. Daley Center
50 West Washington Street
Chicago, Illinois 60602

Attention: Room 2510

Re:  *Wrobel v. Sears, Roebuck and Co.*
02 CH 23058 (Cook County Illinois)
*Moody v. Sears, Roebuck and Co.*
02 CVS 4892 (New Hanover County North Carolina)

Dear Judge Nowicki:

As a result of the notice plan and settlement in the above captioned action, the citizens of North Carolina will receive $66 in cash and coupons, and the entire nationwide class will receive cash and coupons totaling $2,402.[1] The citizens of New Hanover County, where Mr. Moody brought suit on their behalf, will get **nothing** from the settlement. You will recall that plaintiffs' counsel were awarded $1,100,000 in cash and coupons for obtaining this result. There were only 997 claims filed during the claim period[2] and only 317 of those claims were valid.[3] There were 189 claims eligible for a $10 cash payment and 128 claims eligible for a $4 coupon, producing the $2,402 total payout. I am writing to bring these numbers to your attention for a number of reasons.

First, Mr. Shipman, lead counsel for the class, challenged me to do so. In a hearing last week on motions to dismiss the North Carolina action in *Moody v. Sears*, he told me that I should not make any determination of whether the judgment in *Wrobel* was entitled to full faith and credit without bringing my concerns to your attention first. Yielding to his request, I am taking this opportunity to again express my concerns about this settlement. Mr. Shipman told me that

---

[1] See the attached Affidavit of Cindi A. R. Straup, an employee of the claims administrator. Inexplicably, no claims have actually been paid.

[2] Eighteen claims were filed after the deadline and will not be honored.

[3] Roughly two-thirds of the claims were for four-wheel drive vehicles which were ineligible under the settlement. Class members were not notified of that exclusion in the claim process, thus artificially inflating the claims numbers. Realistically only 317 valid claims were received.

he believed he had completely fulfilled his fiduciary duty to the class and was not required to notify you of the abysmal results of settlement administration or take any further action on behalf of the class he represents.[4] As far as he is concerned, this case is over. He is satisfied that he has earned his $1,100,000 fee by generating $2,402 for the class. Under your order, Sears has no obligation to account to you for the results of settlement administration.

Second, Mr. Shipman and Sears have gone to extremes to avoid notifying any court of the failure of the notice plan. Your order did not require them to file any accounting in Illinois. In North Carolina, Sears filed motions to dismiss and asked the court to hear them before obtaining any information about the settlement results. Mr. Shipman then went so far as to file a Petition for Writ of Mandamus in the North Carolina Court of Appeals, endorsed by Sears, to prevent me from having a hearing to find out the settlement results. When both attempts failed, Sears put the required information together in the attached affidavit, and Mr. Shipman said he would have given me the information voluntarily if I had only asked for it rather than ordering it be produced. I adjourned the hearing, and the information was then produced voluntarily by Sears. You can see from the affidavit why they fought so hard to keep the information secret.

Third, and most importantly, the result is simply unjust and the type of result Congress alluded to in providing for removal of some state class actions to federal court. The public will rightly be outraged at the result. The citizens of North Carolina where this litigation originated and on whose behalf it was originally filed will undoubtedly feel wronged by the legal system. As I indicated to you in my letter of November 5, 2004, it is my policy to make the results of all class actions public. This case is no exception. Sunshine is the best disinfectant. As judges, we have to protect the integrity and public perception of the judiciary. Results like this cause the public to lose faith in the bar and the judiciary unless they are corrected.

Fourth, and most seriously, it appears your approval may have been obtained by misrepresentations about the status of the claims as of the November 17, 2004 hearing. Mr. Shipman told you in no uncertain terms that there had been **1,900 claims** filed before the hearing. The attached affidavit shows that there could have been no more than **339 claims** filed before the hearing and that the number was likely less than that. Further, both parties and their counsel should have been aware that roughly two-thirds of those claims were invalid as four-wheel drive vehicles, thus reducing the number of valid claims in existence on the hearing date to around **100**.[5] I cannot conceive of your having approved the settlement if you had been told there were only 100 valid claims. Sears' national counsel, Mr. Fanning, sat silent while Mr. Shipman made representations that both he and Mr. Fanning knew were not true. The following exchange took place at the hearing when you rightfully expressed your concern about the number of claims:

Excerpt (pp.32-34) from Condensed Version of Transcript of Hearing on November 17, 2004 before Judge Nowicki, Circuit Court of Cook County, Illinois, Chancery Division.

---

[4] I have deferred judgment on that issue pending your action.

[5] The affidavit indicates that there were only 339 claims filed for all of November. The affidavit also demonstrates that roughly two-thirds of all the claims were probably invalid as four-wheel drive vehicles. That information was plainly available from the claim form. Thus, Sears and Mr. Shipman knew or should have known before they made representations to you on November 17, 2004 that the number of valid claims was closer to 100 than 1900. They colluded to keep that information from you and lead you to base your approval on inflated, faulty claims information. The total claims, valid and invalid, for the entire period were only 997.

THE COURT: Okay. And when will we know how many claimants we have?

MR. SHIPMAN: Judge, the claim period runs through February of 2005, so I guess the literal answer to your question is that we will know in February of 2005.

THE COURT: *And of course, what happens if only 5 or 10 people respond?*

MR. SHIPMAN: Well, we know so far, Judge -- and again, it's summarized in our memorandum in support -- as of today, and again, people were only able to make claims starting with the end of the notice period, and the last notice ran October 24th, is that right?

MR. FANNING: Yes, that's right.

MR. SHIPMAN: *As of today, actually as of Friday, there were roughly 1,900 or so people that had already made claims with literally thousands more inquiries in terms of website, calls, et cetera, but there had already been 1,900 or so people that had already submitted claims, and the claim period has only been running roughly three weeks.*

THE COURT: But when's the last notice?

MR. SHIPMAN: October 24th was the last notice.

THE COURT: *Are you expecting a lot of people? I mean I would assume that the inquiries would be closer to the notice than they would be a date further away from the notice.*

MR. SHIPMAN: *Judge, I'm not sure with respect to this settlement that that is necessarily true simply because it's Sears, and Sears' reputation is such that everybody, you know, in a family shops at Sears, and when people make their claims, they'll ask their neighbors, they'll ask their friends, hey, did you hear about this Sears settlement? Here's the information by which you can make a claim, whether they tell their son, tell their mother or their father.*[6]

Now, it certainly statistically is so that a larger number of claims came closer to the period of time in which there's notice, but I think that because we have Sears in this particular case, that my not be the case.

THE COURT: *Well, what if come February we only have 2,000 people, 3,000 people, 5,000 people, so that you are short, what are we going to do?*

MR. SHIPMAN: *Well, I guess it depends on how your Honor defines short. Your Honor knows that it is rare that courts in the United States tie an award of fees to the number of people that have showed up because we can't control that.*[7] *That's obviously a function of notice, and we can't force people into claims, especially on the lodestar method, and again, we've analyzed this for you in our brief.*

When you're rewarding the lawyers for the time they've got in the case and not necessarily for the "benefit" conferred to class, we think that the analysis should be, I mean have we billed, have we accumulated $1.3 million in time, and again, as an officer of the court, we will confirm that we have in exchange for a

---

[6] I note here that only 4 claims, all invalid, were received from New Hanover County, thus indicating that not even Mr. Moody and Mr. Shipman called any friends or relatives to tell them about the settlement.

[7] Mr. Shipman is well aware of the fact that my court is one of the "rare" courts concerned about the number of claimants generated by the notice plan. Class counsel does have responsibility for insuring that the notice plan is effective.

payment of S1,050,000 in cash and $50,000 in coupons, *so I understand you Honor's concern, but that's not really going to affect us.*

Transcript of hearing before Judge Nowicki on November 17, 2004 (emphasis supplied).

I do not have access to the written materials submitted to you and therefore do not know if there is a written representation by Mr. Shipman or Sears with respect to the claims made as of November 17, 2004. I am relying on the transcript of the hearing and the attached affidavit for my information.

The total of 317 valid claims is "short" by any definition, and counsel knew there was a problem when they failed to provide the actual number of valid claims at the time of the hearing. It appears you asked the right questions and were given the wrong answers. If that is not the case, I would appreciate your clarifying the discrepancy for me and letting me know you had the right numbers and approved the fee nonetheless.

It is even clearer that counsel knew in December 2004 when they presented the final order to you that the representations they had made in November were untrue.[8] That would explain why they did not recite any information about the number of claims received as of that date in the order.[9]

Whether these undisputed facts support a finding that your approval and the settlement were obtained by fraud and collusion, thus voiding the settlement, is a matter for your consideration initially. I found them worth bringing to your attention. It was clear to me from the questions you asked at the hearing that you were concerned about the success of the notice plan and did not intend to award a huge fee if the class did not benefit from the settlement.

Alternatively, it is apparent that the notice plan failed. If, as Mr. Shipman argued in supporting his fee request, a normal claim rate should be 30 percent,[10] then an actual valid claim rate of 0.000211 should indicate that the notice plan was wholly inadequate. I believe Mr. Shipman's normal claim rate to be unsupported by any empirical evidence. I have searched in vain for years for an empirical study of claims rates in consumer class action cases. There is simply no information available to my knowledge. The fact that out of the entire nation only 997 total claims were filed during the claim period and only 317 valid claims were filed compared to the **250,000 to 500,000** claims he represented would likely be filed should be enough to set this settlement aside. It is hard to believe the "best practical notice" resulted in only 317 valid claims nationwide out of the **1,500,000** potential claimants suggested by counsel for Sears and Mr. Shipman. This notice plan came up "short" by 1,499, 683 claimants.

I doubt that the citizens of Illinois fared any better than those of North Carolina. When it came time to publicize the settlement in the twenty-five largest Sears automotive center markets, no publication took place in local papers in Illinois. It turns out that Wilmington and Raleigh, North Carolina must be bigger Sears automotive center markets than Chicago! Strangely, three

---

[8] By the end of December only 670 claims had been filed. Presumably, two-thirds of those were invalid.

[9] Your final order, which I assume counsel drafted for you, only reflected that there had been some 2,000 inquiries. It said nothing about claims made—a glaring, but clearly intentional omission.

[10] Mr. Fanning was not silent on this representation. He openly supported it by telling you about another Sears case involving a high redemption rate of coupons sent out in a settlement.

of the places where notices w ere p ut i n t he l ocal n ewspapers w ere i n N ew Je rsey, w here t he residents were not eligible to receive benefits. Counsel neglected to tell you that there were 843 Sears automotive centers nationwide. They published local notices in only about 4% of the relevant market, specifically excluding Chicago (where two of the suits were filed) and including New Jersey (where the citizens had already been paid). You may want to inquire into the benefits received by the citizens of Illinois. They may be worse than the $66 recovery by the citizens of North Carolina. It is results like this which, if they go unredressed, provide fodder for those who would strip state courts of their jurisdiction over class actions.

I do not know what you will do with this information. I am sure you are not pleased to receive it. As Mr. Shipman requested, I will await your decision before dealing with the issues of full faith and credit before me. He obviously prefers your forum. Should you decide to void the settlement and put all parties back where they were before any settlement, I will resume administration of the North Carolina action. Please let me know what you decide to do.

Very truly yours,

Ben F. Tennille
Special Superior Court Judge
For Complex Business Cases

BFT/jeh
Enclosure

cc:     Joshua Stein, Senior Deputy Attorney General
        Consumer Protection Division
        North Carolina Department of Justice

        L. Thomas Lunsford II
        North Carolina State Bar

        Hon. Brenda A. Tucker
        Clerk of Superior Court
        New Hanover County

# APPENDIX C



## State of Illinois
## Circuit Court of Cook County
## Chancery Division

Julia M. Nowicki
Judge

May 4, 2005

2510 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-6032
Fax: (312) 603-4704

The Honorable Ben F. Tenille
Special Superior Court Judge
for Complex Business Cases
200 S. Elm Street, Suite 200
Greensboro, N.C. 27401

Re: *Wrobel v. Sears, Roebuck and Co.*
02 CH 23058 (Cook County, Illinois)
*Moody v. Sears, Roebuck, and Co.*
02 CVS 4892 (New Hanover County, North Carolina)

Dear Judge Tenille:

I am in receipt of your letter dated May 3, 2005. I am considering whether I will take action due to the information you have conveyed to me. I appreciate your assistance in this matter, and I will keep you informed.

Very truly yours,

Julia M. Nowicki

Cc: Michael B. Hyman, Esq.
Edward J. Fanning, Esq.
Frank E. Pasquesi, Esq.
Samera S. Ludwig, Esq.
Gary K. Shipman, Esq.
Kent M. Williams, Esq.



State of Illinois
Circuit Court of Cook County
Chancery Division

Julia M. Nowicki
Judge

2510 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-6032
Fax: (312) 603-4704

November 22, 2005

The Honorable Ben F. Tenille
Special Superior Court Judge
For Complex Business Cases
200 S. Elm St., Suite 200
Greensboro, North Carolina 27401

Re:     Wrobel v. Sears, Roebuck and Co., 02 CH 23058 (Cook County, Illinois)
        Moody v. Sears, Roebuck and Co., 02 CVS 4892 (New Hanover County, North Carolina)

Dear Judge Tenille:

I promised that I would keep you apprised of the progress in this case. Accordingly, I have enclosed the order entered on November 15, 2005 in Wrobel v. Sears, Roebuck and Co. I hope to see you at a judicial conference in the future in some nice climate.

Very truly yours,

Julia M. Nowicki

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |
|---|---|
| MICHELLE WROBEL, DONALD E. BAGLIEN, on behalf of themselves and others similarly situated, ) ) ) ) ) | Civil Action No. 02 CH 23058 |
| Plaintiff, ) ) | Judge Julia Nowicki |
| vs. ) ) | |
| SEARS ROEBUCK AND CO., ) ) | |
| Defendant. ) ) | |

## ORDER

Pursuant to a voluntary agreement reached by Class Counsel and Defendant after the Court's entry of the Order and Judgment Granting Final Approval of Settlement ("Final Order") on December 16, 2004, the Court having been advised of the voluntary agreement as reflected in the attached letter submitted by Defendant, and the Court having jurisdiction to enter an Order relating to Class Counsel fees as provided in the Final Order,

**IT IS HEREBY ORDERED:**

The voluntary agreement between the parties regarding Class Counsel fees as provided in the attached letter will be allowed. This voluntary agreement does not alter any of the Court's previous Findings Of Fact or Conclusions of Law contained in the Final Order. The voluntary agreement does not disturb the finality of the Final Order or otherwise operate to revest this Court with jurisdiction in the matter.

SO ORDERED this _____ day of November 2005.



ENTERED

NOV 15 2005

JUDGE
_____
THE HONORABLE JULIA NOWICKI

# UNGARETTI
## ᗺ HARRIS

UNGARETTI ᗺ HARRIS LLP

**CHICAGO**
3500 Three First National Plaza
Chicago, Illinois 60602.4283
Telephone: 312.977.4400
Fax: 312.977.4405

**WASHINGTON**
1500 K Street, N.W., Suite 250
Washington, D.C. 20005.1714
Telephone: 202.639.7500
Fax: 202.639.7505

**SPRINGFIELD**
400 E. Jefferson Street, Suite 1200
Springfield, Illinois 62701.1053
Telephone: 217.544.7000
Fax: 217.544.7950

www.uhlaw.com

SAMERA S. LUDWIG
312.977.4105
ssludwig@uhlaw.com

**BY HAND DELIVERY**

October 27, 2005

Honorable Judge Julia M. Nowicki
Circuit Court of Cook County
Richard J. Daley Center, Room 2510
Chicago, IL 60602

     Re:    **Wrobel, et al. v. Sears, Roebuck and Co.**
               **Case No. 02 CH 23058**

Dear Judge Nowicki:

As you are aware, in connection with the settlement of this matter and the related matters of *Paul Skurman v. Sears Roebuck and Co.*, No. 02-CH-18740 (Circuit Court of Cook County, Illinois) and *Moody v. Sears Roebuck and Co.*, No. 02-CVS-4892 (Superior Court of North Carolina), Class Counsel requested attorney's fees in the amount of $1,050,000.00 in cash and $50,000.00 in Group 2 coupons. On December 16, 2004, following the fairness hearings, the Court entered the Order and Judgment Granting Final Approval of Settlement ("Final Order") and approved Class Counsel's fee request.

The claims period had since concluded and the total number of claims filed by the class members has been lower than anticipated. In light of that, Class Counsel and Sears have agreed voluntarily to reduce the attorneys' fees awarded to Class Counsel pursuant to the Final Order. Specifically, Class Counsel has agreed to donate $100,000.00 of the cash portion of its attorneys' fees to a cy pres recipient that will be determined by the parties in consultation with the Court. In addition, Class Counsel will forego receipt of the $50,000 in Group 2 coupons. Instead, Sears will convert the $50,000.00 in Group 2 coupons to cash and will donate $50,000.00 to the same cy pres recipient.

UHDOCS-717268-01

# UNGARETTI
## �é HARRIS

Hon. Judge Julia M. Nowicki
October 27, 2005
Page 2

This voluntary reduction of Class Counsel's attorneys' fees does not affect the finality of the Final Order.

Very truly yours,

Samera S. Ludwig

cc:    All Class Counsel
       Edward J. Fanning, Esq.

UHDOCS-717268-01

# APPENDIX D

**FILED**

**MAR 0 5 2004**

Division of Consumer Affairs

## SETTLEMENT AGREEMENT AND RELEASE

The parties to this Settlement Agreement and Release entered into by and between the Attorney General and the Director of the Division of Consumer Affairs of the State of New Jersey (collectively, "the State of New Jersey" or "State"), and Sears, Roebuck and Co. ("Sears") agree and state that:

### I.   RECITALS

WHEREAS, the State of New Jersey, through its former Attorney General, David Samson, and its Director of the Division of Consumer Affairs, Reni Erdos, filed a Complaint against Sears in the Superior Court of New Jersey, Chancery Division, Hudson County, on or about October 10, 2002, seeking recovery for violations of the New Jersey Consumer Fraud Act of 1960, as amended ("CFA"), N.J.S.A. 56:8-1 et seq. and regulations promulgated thereunder, N.J.A.C. 13:45A-1.1 et seq.;

WHEREAS, the State of New Jersey, through its current Attorney General, Peter Harvey, and its Director of the Division of Consumer Affairs, Reni Erdos, filed a First Amended Complaint against Sears in the Superior Court of New Jersey, Chancery Division, Hudson County on or about June 4, 2003, adding claims and substituting current Attorney General, Peter Harvey, for former Attorney General, David Samson;

WHEREAS, Sears denies all the allegations in the Complaint, the First Amended Complaint, and the Action and further denies any liability to the State whatsoever;

WHEREAS, the State and Sears desire to resolve the Action at this time to avoid the costs, expenses, distractions, risks, and delays of protracted litigation;

WHEREAS, the State and Sears believe that the public interest will be served by this Settlement Agreement and Release;

NOW, THEREFORE, to fully and finally resolve this matter, and in consideration of the mutual execution of this Settlement Agreement and Release, Sears and the State agree as follows:

## II.    DEFINITIONS

The following definitions shall apply in this Settlement Agreement and Release:

A.    The term "Action" shall mean the lawsuit commenced by the State of New Jersey against Sears, Roebuck and Co., which is currently captioned <u>Peter C. Harvey, Attorney General of the State of New Jersey, and Reni Erdos, Director of the Division of Consumer Affairs v. Sears, Roebuck and Co.</u>, Docket No. HUD-C-144-02, and all pleadings and proceedings thereto.

B.    The term "Affected Consumer" shall refer to the 12,544 consumers identified by the State during the Action who purchased a Four-Wheel Alignment from Sears between January 1, 1997 and October 1, 2000 and who the State alleges should have been charged for a different alignment service.

C.    The term "Additional Affected Consumer" shall refer to any customer (other than Affected Consumers) who purchased a Four-Wheel Alignment from Sears between January 1, 1997 and October 1, 2000 for a vehicle whose rear wheels could not be adjusted, or where rear adjustments were possible only with the addition of aftermarket parts that were necessary at the time of the alignment and that were not installed by Sears, as determined by Plaintiff's Exhibit 15A in the Action.

D.    The terms "Attorney General," "Director of the Division of Consumer Affairs," "State of New Jersey," and "State" shall mean the Attorney General of the State of New Jersey, the Director of the Division of Consumer Affairs of the State of New Jersey, the State of New Jersey and its political subdivisions, the Division of Consumer Affairs, the Office of Consumer

- 2 -

Protection, and all of their respective employees, attorneys, successors, affiliates, agents, and assigns.

E.    The term "Complaint" shall mean the original pleading filed by the State of New Jersey on or about October 10, 2002, naming Sears as a defendant, and any and all amendments thereto, including the First Amended Complaint filed on or about June 4, 2003.

F.    The term "Effective Date" shall mean the date this Settlement Agreement and Release is fully executed by the State and Sears.

G.    The term "Plaintiff's Exhibit 15A" in the Action shall refer to the Hunter Engineering Company Vehicle Suspension Adjustment Information, Form 1708T, 06/02.

H.    The term "Parties" shall refer to plaintiffs Peter C. Harvey, Attorney General of the State of New Jersey, and Reni Erdos, Director of the New Jersey Division of Consumer Affairs, and defendant Sears, Roebuck and Co.

I.    The term "Released Claims" shall mean all claims, rights, and causes of action, which the State could bring, has brought, or could have brought relating in any way to: (a) Sears' wheel alignment marketing, advertising, and sales policies and practices from 1997 to the Effective Date; (b) Sears' terminology for describing alignments from 1997 to the Effective Date; (c) Sears' wheel alignment billing and pricing policies and practices from 1997 to the Effective Date; (d) Sears' policy and practice of charging customers for "Four-Wheel," "Thrust," and "Four-Wheel Drive/Light Truck Thrust" alignments from January 1, 1997 to October 2000; (e) Sears' policy and practice of charging customers for "All-Wheel" alignments; (f) Sears'

compensation arrangements for employees from January 1, 1997 to the Effective Date; (i) Sears' policies and practices for providing customers with estimates from January 1, 1997 to the Effective Date; (j) Sears' policies and practices for obtaining authorization from customers to perform automotive services from January 1, 1997 to the Effective Date; and (k) Sears' actual performance of automotive services related in any way to tire inspection and/or tire installation, and brake work, from January 1, 1997 to the Effective Date. To the extent the State did or could have alleged that any of the conduct referenced in subparts (a) through (k) above comprised a violation of the July 1992 Agreement between Sears and the State, the September 1992 Supplemental Agreement between Sears and the State and/or the May 29, 1997 Supplemental Agreement between Sears and the State, such claims, rights, and causes of action are also "Released Claims."

J.      The terms "Satisfactory Evidence of Eligibility" shall refer to proof in the form of a receipt or invoice evidencing the purchase of a Four-Wheel Alignment from Sears between January 1, 1997 and October 1, 2000 for a motor vehicle where adjustments to the rear wheels were not possible or where rear adjustments were possible only with the addition of aftermarket parts that were necessary at the time of the alignment and that were not installed by Sears, as determined by reference to Plaintiff's Exhibit 15A in the Action.

K.      "Sears, Roebuck and Co." and "Sears" shall mean the corporation of that name incorporated in the State of New York and headquartered at 3333 Beverly Road, Hoffman Estates, Illinois, and all of its past, present, and future: (1) predecessors-in-interest and successors-in-interest; (2) subsidiaries, affiliates, and operating divisions; (3) employees and all part-time and contract personnel; (4) officers and directors; (5) lawyers, agents, and representatives; and (6) insurers, assigns, and underwriters.

## III.  AGREEMENT COVENANTS

### A.  Restitution

1.  Sears shall pay the sum of $10.00 (TEN DOLLARS AND NO CENTS) to the 12,544 Affected Consumers identified by the State during the Action who between January 1, 1997 and October 1, 2000 purchased a Four-Wheel Alignment from Sears and who the State alleges should have been charged for a different alignment service.

2.  The State shall supply Sears with the names and addresses of the 12,544 Affected Consumers. Within 21 days of receipt of such names and addresses, Sears shall mail the $10 payment described in paragraph A(1) above.

3.  The obligation of Sears to make payments under paragraph A(1) and (A)(2) above shall be fully discharged at the time Sears sends by first-class United States mail a $10.00 payment to the Affected Consumers at the addresses supplied by the State or, in the event any such payment is returned by the United States Postal Service to Sears, at the time Sears, after exercising reasonable diligence to locate the customer's current address, makes a second attempt to send by first-class United States mail the payment described in paragraphs A(1) and A(2) above.

4.  In addition to the 12,544 Affected Consumers, Sears shall make a $10.00 payment to any Additional Affected Consumer who presents to Sears Satisfactory Evidence of Eligibility within twelve months of the date of the Effective Date.

5.  The State agrees that Sears will require any Affected Consumer or Additional Affected Consumer who elects to redeem a $10.00 payment from Sears to release Sears from all Released Claims relating to their alignment purchase from Sears in the transaction referenced in

paragraph A(1) above. The State and Sears agree that no other consumers are releasing legal rights or obligations against Sears in connection with this Settlement Agreement and Release.

6.    Sears shall forward to the State any monies which cannot be distributed to Affected Consumers within 120 days of the Effective Date. The State may use and/or apply such funds to any other lawful use.

B.    **Settlement Payment**

1.    Within ten (10) days of the Effective Date, Sears shall pay to the State of New Jersey the sum of $500,000.00 (FIVE HUNDRED THOUSAND DOLLARS AND NO CENTS) for the claims set forth in the State's Complaint. Said payment shall be applied to the funding of future and further Division of Consumer Affairs' initiatives. Such payment shall be made by wire transfer pursuant to instructions provided by the State.

2.    Sears shall reimburse the State of New Jersey for proven out-of-pocket costs incurred in connection with the State's investigation of Sears and the litigation of the Action, pursuant to the following procedure: the State shall submit a cost report to the Honorable Stephen Orlofsky of Blank, Rome LLP, 210 Lake Drive E., Woodland Falls Corporate Park, Suite 200, Cherry Hill, New Jersey. Judge Orlofsky will make a determination, which shall be binding upon Sears and the State, as to whether the costs (1) were actually incurred by the State in connection with the investigation and litigation; and (2) are sufficiently documented. This determination shall be disclosed no earlier than 25 days from the date on which the State issues its press release announcing this Settlement Agreement and Release. If the State confirms in writing to Judge Orlofsky and Sears that it will not issue a press release about this settlement agreement, Judge Orlofsky's determination shall be disclosed no earlier than 25 days from the date of the State's notice. Sears shall remit payment of these costs to the State within fifteen (15)

- 6 -

days of the date Judge Orlofsky's determination is disclosed. The payment shall be made by wire transfer pursuant to instructions provided by the State.

3.      Sears shall not pay any attorney's fees or paralegal fees incurred by the State in connection with the investigation or litigation of this Action.

4.      Sears shall remit to the State by wire transfer, pursuant to instructions provided by the State, the sum of $7,500.00 (SEVEN THOUSAND FIVE HUNDRED DOLLARS AND NO CENTS) to reimburse the State for providing the addresses of Affected Consumers.

C.      **Business Practices**

1.      The State and Sears acknowledge that from October 2000 to present Sears has offered an "All-Wheel Alignment" service to New Jersey consumers and that Sears is not required by this Settlement Agreement and Release to make changes to its current alignment procedures or related consumer practices or to make any payment or restitution to any consumer who purchased an "All-Wheel Alignment" from Sears from October 2000 to present.

D.      **Dismissal Of Action With Prejudice**

1.      Within five (5) days of the date of the State's receipt of the payment referenced in paragraph III.B.(1) above, the State shall take all necessary measures to effectuate the dismissal with prejudice of the Action.

E.      **Release**

1.      For the consideration set forth herein, the State does hereby release and forever discharge Sears from any and all Released Claims.

F.      **No Admission Of Wrongdoing**

1.      It is understood and agreed by the State and Sears that neither the execution of this Settlement Agreement and Release nor any action to implement this Settlement Agreement

- 7 -

and Release is intended to be construed as an admission by Sears or the State of any fault or liability of any kind, nor as a precedent for the resolution of any other dispute or litigation involving Sears relating to the Action.

### G.    Press Releases

1.      No press release or press conference within 90 days of the Effective Date by the State or Sears shall estimate the amount of out-of-pocket costs that will be reimbursed to the State by Sears or assign, describe or attribute any dollar value to such costs.  Any press release or press conference within 90 days of the Effective Date shall state only that Sears will pay costs to the State "in an amount to be determined." Nothing in this provision shall prevent the Attorney General from responding to a *bona fide* request under the Open Public Records Act, testifying before a legislative committee, or otherwise discharging duties required by law.

## IV.    DISPUTE RESOLUTION

A.     In the event the State and Sears have a dispute arising from the implementation of this Settlement Agreement and Release, they shall negotiate in good-faith to resolve such differences. If the Parties are unable to reach agreement, the disputes shall be submitted to Judge Orlofsky for binding review and resolution.

## V.    NOTICES UNDER THIS SETTLEMENT AGREEMENT

A.     Except as otherwise provided herein, any notices or other documents required to be sent to the State or Sears pursuant to this Settlement Agreement and Release shall be sent by United States mail, Certified Mail Return Receipt Requested, or other nationally recognized courier service that provides for tracking services and identification of the person signing for the documents. The notices and/or documents shall be sent to the following addresses:

- 8 -

modification or waiver of any provision shall be valid unless in writing and signed by the Parties hereto.

D.    The Parties acknowledge that New Jersey law will govern for purposes of enforcing this Settlement Agreement and Release.

E.    This Settlement Agreement and Release shall be binding upon the Parties and shall be binding on any and all future purchasers, merged parties, inheritors or other successors-in-interest of Sears. In no event shall assignment of any right, power, or authority under this Settlement Agreement and Release avoid compliance with this Settlement Agreement and Release.

F.    The State and Sears represent that an authorized representative of each has signed this Settlement Agreement and Release with knowledge and understanding of its terms, and that such representative has authority to legally bind each party.

G.    This Settlement Agreement may be executed in several counterparts, each of which so executed shall be deemed an original, but all such counterparts shall together constitute one and the same instrument. Faxed signatures shall be deemed effective and binding.

AGREED AND ACCEPTED:

PETER C. HARVEY
ATTORNEY GENERAL OF NEW JERSEY

Dated: 3/5/04          By: _____

RENI ERDOS
DIRECTOR OF THE DIVISION OF CONSUMER
AFFAIRS

Dated: 3/5/04          By: _____

SEARS, ROEBUCK AND CO.

Dated:          By: _____

Title: _____

AGREED AND ACCEPTED:

                              PETER C. HARVEY
                              ATTORNEY GENERAL OF NEW JERSEY


Dated:                        By: _____



                              RENI ERDOS
                              DIRECTOR OF THE DIVISION OF CONSUMER
                              AFFAIRS

Dated:   3/5/04               By: _____



                              SEARS, ROEBUCK AND CO.


Dated: March 5, 2004   By: _____

                       Title: _____

AGREED AND ACCEPTED:

PETER C. HARVEY
ATTORNEY GENERAL OF NEW JERSEY

Dated: 3/5/04

By: _____

RENI ERDOS
DIRECTOR OF THE DIVISION OF CONSUMER
AFFAIRS

Dated: _____

By: _____

SEARS, ROEBUCK AND CO.

Dated: _____

By: _____

Title: _____

- 11 -

AGREED AND ACCEPTED:


                              PETER C. HARVEY
                              ATTORNEY GENERAL OF NEW JERSEY


Dated:                        By: _____



                              RENI ERDOS
                              DIRECTOR OF THE DIVISION OF CONSUMER
                              AFFAIRS


Dated:                        By: _____



                              SEARS, ROEBUCK AND CO.


Dated: _March 5, 2004_   By: _Peter J. Brennan_

                         Title: _Acting Deputy General Counsel_


- 11 -